234 F.Supp.2d 872 (2002)
Debra KEACH and Patricia Sage, Plaintiffs,
v.
U.S. TRUST COMPANY, N.A., et al., Defendants.
Case No. 01-1168.
United States District Court, C.D. Illinois.
November 18, 2002.
*873 Dean B. Rhoads, Robert Rhode, Edward Sutkowski, Steven Oates, Sean Anderson, Sutkowski & Rhoads, Peoria, IL, for Plaintiffs Debra Keach and Patricia Sage.
Timothy Bertschy, Heyl, Royster, Voelker & Allen, Peoria, IL, Robert Eccles, Shannon M. Barrett, O'Melveny & Myers LLP, Washington, DC, for Defendant U.S. Trust Company, NA, fka U.S. Trust Company of California.
Charles Roth, James Springer, Joseph Z. Sudow, Kavanagh Scully Sudow White & Frederick, Peoria, IL, Michael T. Graham, Nancy Ross, McDermott Will & Emery, Trent P. Cornell, Duane Morris LLC, Chicago, IL, for Defendant Ellen D. Foster, Executrix of the Estate of Thomas S. Foster and as CoTrustee of the Thomas S. Foster Trust executed on 4/14/94.
Michael T. Graham, Nancy Ross, McDermott Will & Emery, Chicago, IL, for Defendant The Northern Trust Company, an Illinois Corporation as Co-Trustee of the Thomas S. Foster Trust executed on 4/14/94.
Richard J. Paulter, Jennifer Baetje, Thompson & Coburn, St. Louis, MO, for Defendants Robert A. Ostertag, Jr., Terry P. Cole, Alan R. Dix, Jon Elletson, A. Robert Pellegrino.
James Bailey, Paul Ondrasik, Jr., Steptoe & Johnson, Washington, DC, Roy Davis, David Lubben, Davis & Campbell LLC, Peoria, IL, for Defendants Valuemetrics, Inc.
Mark Casciari, Ian Hugh Morrison, Sari M. Alamuddin, Seyfarth Shaw, Chicago, IL, for Defendant Houlihan, Lokey, Howard & Zukin, Inc.
Charles Roth, James Springer, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendant Stephen P. Bartley.
Stephen Gay, Jeffrey Alan Ryva, Husch & Eppenberger LLC, Peoria, IL, for Defendant Lyle Dickes.
*874 Jeffrey Rock, Hasselberg Rock Bell & Kuppler, Peoria, IL, for Defendant James Freid.
Charles Roth, James Springer, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendant Dale Fujimoto.
John Elias, Robert Riffle, Cynthia Elias, Elias Meginnes Riffle & Seghetti, Peoria, IL, for Defendant William Gehring, Henry Gregory, II, John F. Halpin, James Kyle, John Lappegaard, George McKittrick, Clayton Patino, Jerry Rathmann, W. Thomas Stumb, Mark Swedlund, Leo Vanderlugt, Robert Wilson, Bruce Wright.
Jeffrey Rock, Hasselberg Rock Bell & Kuppler, Peoria, IL, for Defendant Richard Hodgson.
Dean Essig, Washington, IL, for Defendant Gregory McAllister.
Charles Roth, James Springer, Joseph Sudow, Kavanagh Scully Sudow White & Frederick, Peoria, IL, for Defendants Michael Norbutas, Frederick Stuber, and For Defendant Ashley Anne Foster, as trustee or agent of the Ashley Anne Foster Irrevocable Trust, and Melvyn R. Regal, individually, as trustee or agent of the Steven Jay Regal Trust, as trustee or agent of the Judi Lynn Regal Trust, and as trustee or agent of the John E. Regal Trust.

ORDER
MIHM, District Judge.
Now before the Court is Plaintiffs' Motion for Partial Summary Judgment as to Liability Against Defendants Ellen D. Foster, as Executrix of the Estate of Thomas S. Foster, and Melvyn R. Regal: Admitted Failure to Disclose Material Information. For the reasons set forth below, the Motion for Summary Judgment [# 269] is GRANTED IN PART and DENIED IN PART.

FACTUAL BACKGROUND
The following facts are not in dispute unless otherwise indicated. Foster & Gallagher, Inc. ("F & G") was a direct marketing firm engaging in the marketing of gifts, housewares, and novelty items through the mail. Over time, F & G began to market horticultural products through its direct mail operations. F & G was an employer engaged in commerce or in an industry or activity affecting commerce within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA").
On January 1, 1988, F & G established an employee stock ownership plan ("ESOP"). On January 1, 1999, the ESOP was amended and restated and continues to operate as a defined contribution, leveraged employee stock ownership plan, covering substantially all employees of F & G and its subsidiaries. The ESOP is an employee pension benefit plan within the meaning of ERISA. F & G is the sponsor of the ESOP, and Plaintiffs Debra Keach and Patricia Sage (collectively referred to as "Plaintiffs") are participants in the ESOP.
In 1995, Thomas Foster ("Foster") was CEO/Chairman of the Board of Directors of F & G, and was also a director of Michigan Bulb Corporation ("MBC"), a subsidiary purchased by F & G in October 1992. Foster died on July 11, 1996, and Ellen D. Foster is the executrix of his estate. Defendant Melvyn Regal ("Regal") was at all relevant times a shareholder and executive of F & G. In 1995, he was Vice Chairman of the Board of Directors of F & G and a director of MBC.
The F & G ESOP began in 1988, when it purchased 3,587,573 shares of F & G stock from certain shareholders, including Foster and Regal, using a $3 million cash contribution from F & G and $47 million from the proceeds of a loan through F & *875 G. In 1994, Foster estimated that his F & G stock could be worth twice as much as the $40 million face value of his life insurance coverage and began to push for the $70 million leveraged purchase of F & G shares by the ESOP that was ultimately consummated in December 1995.
Defendant Valuemetrics performed an annual valuation of F & G shares for the ESOP every year from 1988 through 1994. On March 16, 1995, Valuemetrics proposed to assist the ESOP Administrative Committee and F & G's Board of Directors in outlining and reviewing the significant elements of a subsequent sale or sales of stock to the ESOP. By March 23, 1995, Foster had told Lyle Dickes ("Dickes"), F & G's Executive Vice President, to go ahead with the Valuemetrics proposal.
Valuemetrics met with F & G representatives on May 8, 1995. Based on the assumption that the shareholders wanted liquidity in the near term and for F & G to remain healthy and viable, Valuemetrics concluded: (1) a large leveraged ESOP ($50-70 million) or a recapitalization would meet those goals; (2) an ESOP of this size would be able to acquire a significant number of shares but would not be able to buy all of the remaining shares; (3) the selling shareholders could take advantage of favorable tax treatment; (4) a recapitalization would allow the shareholders to sell their entire interest but would result in capital gains tax; and (5) an initial public offering ("IPO") of the stock would be less desirable because the market may restrict the amount of shares the controlling shareholders could sell as part of the IPO. On May 10, 1995, Valuemetrics issued a valuation of F & G as of December 31, 1994 in which it concluded that on a marketable minority basis, the value of the capital stock was $162 million, which represented a 38% increase over the previous year's valuation of $117 million. At this time, Valuemetrics was also consulting with F & G about ownership transition strategies and the expanded use of the ESOP as a means of achieving the desired purchase or liquification of the stock holdings of the selling shareholders, including Foster and Regal. Given the primary goals of these shareholders to provide immediate liquidity and to maximize the present value of their after-tax proceeds received from a sale of their stock and the value of their residual shares in F & G, Valuemetrics found a leveraged ESOP transaction and a recapitalization or sale of F & G to a strategic buyer to be "far superior" options.
Defendant U.S. Trust is the present trustee of the ESOP and a fiduciary with respect to the ESOP. In this capacity, U.S. Trust holds the plan assets, manages the assets of the ESOP, makes distributions to participants, and administers the payments of interest and principal on certain loans. Norman Goldberg ("Goldberg") was at relevant times the manager of U.S. Trust's Washington, DC, office and acted on behalf of its Special Fiduciary Committee where U.S. Trust acted as an institutional trustee specialized investment manager for transactions involving ERISA issues. In late June 1995, Goldberg met with Regal, Dickes, and others. By July 5, 1995, F & G had reached an agreement with U.S. trust for a fee schedule regarding the contemplated ESOP transaction which included fees for the transactional decision and follow-up services as the independent fiduciary.
On July 17, 1995, Valuemetrics advised F & G that it would be pleased to be retained by F & G's board of directors to provide financial advisory services, including: (1) updating its December 31, 1994, ESOP valuation analysis to estimate a revised range for the fair market value of F & G shares on a control basis; (2) determining *876 an optimal structure of the security to be purchased by the ESOP in order to maximize the value received by the selling shareholders; (3) preparing a transaction memorandum for the board discussing the important aspects of the transaction structure; (4) meeting with the board to discuss the transaction memorandum; and (5) presenting and issuing an opinion on the fairness of the transaction. Valuemetrics then issued a valuation on July 24, 1995, reporting that as of July 20, 1995, the value of F & G stock on a control basis was $229.2 million.[1]
On August 31, 1995, Dickes signed the U.S. Trust engagement letter on behalf of F & G, and U.S. Trust replaced Magna Bank as the trustee for the ESOP. At that time, U.S. Trust was being retained to act as the decisional trustee and to serve as trustee for a short additional period; US Trust had no expectation of being the continuing trustee of the ESOP.
On September 26, 1995, Defendant Houlihan Lokey ("Houlihan") was engaged to render a written opinion to U.S. Trust as the ESOP trustee as to whether the proposed stock transaction was fair to the ESOP from a financial point of view. The engagement letter indicated that although Houlihan would report solely to U.S. Trust, F & G would pay Houlihan's fees and expenses, and Houlihan would use, rely on, and assume the accuracy of "without independent verification, data, material, financial forecasts and projections and other information with respect to the Company [F & G], furnished to Houlihan Lokey by or on behalf of the Company [F & G] and its agents, counsel, employees and representative."
On September 30, 1995, Valuemetrics issued its first transaction memorandum to the F & G board of directors describing a proposed offer to sell 2,916,667 shares to the ESOP at $24.00 per share. In its memorandum, Valuemetrics noted that the memorandum included certain statements, including projections, with respect to the anticipated future performance of F & G and cautioned that: (1) such statements were based on various estimates and assumptions by F & G, which estimates and assumptions may or may not prove to be correct; (2) although the projections contained therein had been prepared with significant good faith input from F & G's management, such projections involve significant elements of subjective judgment and analysis and would be materially different if different estimates and assumptions were employed; and (3) no representation was made as to the accuracy of any such statements, and there could be no assurance that the projected results would be obtained.
Valuemetrics then summarized the ESOP transaction as follows: (1) F & G's board of directors would authorize the conversion of the current Executive Incentive Plan ("EIP") from a book value basis to a market value basis, which would create a significant income tax benefit to F & G; (2) F & G's management employees would have the opportunity to exercise 527,141 EIP options at an average exercise price of $4.60 per share; (3) of the 2,916,667 total shares offered to the ESOP, 1,790, 243 shares would be offered on a pro-rata basis from Foster and Regal, and 1,126,424 shares would be offered by management, either through the sale of existing shares or through the exercise of options granted as part of the EIP; (4) those employees who sold shares to the ESOP would have an opportunity to purchase, on a pro-rata basis, 626,858 newly issued, restricted *877 shares at market value; and (5) $10.25 million of the proceeds generated from the recapitalization of the EIP shares would be used to repay existing, non-tax preferred debt from Comerica Bank and NBD Bank. Following this transaction, the ESOP would own 51.7% of the equity value of F & G.
On October 17, 1995, representatives from U.S. Trust and Houlihan met with executives of F & G to perform due diligence regarding the ESOP transaction. They met with Regal, Robert Pellegrino (former President, Vice Chairman of the Board of F & G), Frederick Stuber (F & G's Senior Vice President of Finance), Dickes, Joseph Sudow (an attorney from Kavanagh, Scully, Sudow, White, and Frederick, P.C. (the "Kavanagh firm")), and others for most of a day. US Trust's Goldberg also recalls a discussion that day with Robert Ostertag (former President and CEO of MBC; President and CEO of F & G) involving MBC and its sweepstakes marketing.
On October 26, 1995, Valuemetrics issued an Analysis of Value for the ESOP purchase in which it concluded that the value of F & G as of October 24, 1995, ranged from $298.5 to $311.4 million on a marketable control basis.
At a Board of Directors meeting on October 26-27, 1995, the F & G board adopted a resolution approving the proposed ESOP transaction and authorizing the officers of the corporation to take all steps necessary and proper to bring about the completion of the transaction. The members of the Executive Committee, which consisted of Foster, Regal, and Pellegrino, were authorized to approve changes to the proposal.
MMI was F & G's magazine subscription agency that marketed subscriptions using, among other promotional tools, a sweepstakes. In November 1995, which is between the time the board approved the ESOP transaction and the actual issuance of the Stock Purchase Agreement, F & G decided to close MMI. A memo announcing the closure made reference to changes in the stampsheet/sweepstakes business having "a very negative effect on the magazine agency business."
Price negotiations involving F & G, U.S. Trust, Valuemetrics, and Houlihan continued during the month of November 1995. On November 29, 1995, U.S. Trust announced that it was willing to recommend that the ESOP purchase a controlling block of F & G shares at $19.50 per share.
At 10:00 a.m. on November 29, 1995, F & G's board held a telephonic meeting to discuss the proposed sale price per share. The board authorized the Executive Committee to proceed with the ESOP transaction at a price of $19.50 per share. Valuemetrics then issued a second transaction memorandum on December 7, 1995, which reflected the $19.50 per share price.
On December 12, 1995, the firm of Sonnenschein, Nath & Rosenthal, which was retained as counsel for U.S. Trust in connection with the due diligence for the ESOP transaction, faxed a Legal Document Review Memorandum to the Kavanagh firm, as counsel for F & G, Foster, and Regal, requesting certain documents to be provided for review. Among the documents requested were copies of any significant correspondence with any regulatory agencies. As a result of this request, U.S. Trust's attorneys knew before closing on the ESOP transaction that there had been complaints and investigations regarding MBC's use of sweepstakes marketing, because such information was contained in the legal reports to F & G's board of directors that were turned over in response to the request.
*878 On December 19, 1995, the ESOP transaction was approved by U.S. Trust's Special Fiduciary Committee. The next day, on December 20, 1995, F & G's Executive Committee unanimously entered a resolution authorizing the Vice Chairman or any Vice President of the company to execute and deliver certain documents, including the Note Agreement between the company and the lenders, $19,999, 998.50 Series A Senior ESOP Notes, $50,000,000 Series B Senior ESOP Notes, the F & G Employee Stock Ownership Trust as amended and restated effective December 20, 1995, and the F & G Employee Stock Ownership Plan as amended and restated effective January 1, 1995. The resolution also authorized the officers of the company to take "all other such actions that are necessary and proper to effectuate the above resolution...." Pursuant to this authority, Regal, acting on behalf of F & G, appointed U.S. Trust as trustee of the ESOP and signed the amended and restated Employee Stock Ownership Trust that same day.
Also on December 20, 1995, U.S. Trust made written findings in connection with the ESOP transaction. In the written findings, U.S. Trust expressly noted its reliance on the opinions it received from Houlihan, Sonnenschein Nath & Rosenthal as counsel to the trustee, Mayer Brown & Platt as the company's special ESOP counsel, the Kavanagh firm as general corporate counsel to F & G, and Price Waterhouse, as well as Valuemetrics' transaction memorandum, the representations and warranties of F & G, and its controlling shareholders, and the pertinent finance documents. US Trust stated that the terms and conditions of the transaction were prudent and reasonably designed to further the purposes of the ESOP, satisfied the requirements of Section 408(e) of ERISA and Section 4875(d)(13) of the Internal Revenue Code, and also that the purchase price of the shares did not exceed the fair market value of the shares.
Goldberg signed these findings on behalf of U.S. Trust although at that time: (1) he had not seen the packet of documents that had been given to F & G in the course of its due diligence in 1992, which included a discussion of increased state regulation of sweepstakes; (2) he had not been made aware that W. Thomas Stumb, the CFO of MBC, had identified increased state regulation of sweepstakes as an area of concern during F & G's due diligence of MBC; (3) he had not seen the overview of the state of the law and trends impacting sweepstakes that had been provided to MBC in 1991 or been advised that MBC had been told that the laws of several states could be read to bar certain sweepstakes approaches; (4) he does not recall seeing the Fall 1993 issue of MBC's newsletter in which Dale Fujimoto, MBC's Senior Vice-President of Marketing, indicated the importance of sweepstakes marketing to MBC's success; (5) he had not seen a copy of a July 5, 1994, letter from the Alabama Attorney General's Office asserting that one of MBC's promotions violated the Alabama Deceptive Trade Practices Act; (6) he was not aware that MBC knew about amendments to the Georgia Fair Business Practices Act that may or may not have been applicable to MBC's sweepstakes marketing; (7) he did not recall seeing a copy of a letter from MBC's counsel to Price Waterhouse regarding trends in the regulation of sweepstakes; (8) he had not seen a copy of a letter from a customer to Foster indicating that he had reported MBC to the Washington Attorney General for its marketing practices; (9) he had not seen the Iowa Department of Justice letter dated October 11, 1995, requesting that MBC discontinue use of all prohibited solicitations in that state; (10) he had not seen copies of specific consumer complaints about MBC's sweepstakes or an *879 October 26, 1995, inquiry from the Arkansas Attorney General following up on one complaint; (11) he did not receive a copy of a May 4, 1995, letter from another customer making a fraud claim against MBC to the Michigan Attorney General; (12) he did not receive a copy of a Civil Investigative Demand issued to MBC by the Nebraska Attorney General on December 14, 1995; (13) he was not aware of the specific percentage of MBC's business that was generated by sweepstakes or the exact percentage of F & G's business that was attributable to MBC; and (14) he did not see specific inquiries received from three states in the two weeks prior to October 19, 1995.
Later on December 20, 1995, U.S. Trust entered into a Stock Purchase Agreement with Foster, Regal, Pellegrino, and other F & G officers and directors. Paragraph 5.7 of the Stock Purchase Agreement stated in relevant part:
Neither the Company nor any Subsidiary is engaged in or a party to any legal action, suit, investigation, arbitration or other proceeding pending or, to the best knowledge of each Controlling Shareholder any Subsidiary or any of their respective properties at law or in equity or before or by any governmental department, commission, board, bureau, agency or instrumentality, and neither the Company or any Subsidiary has been charged with or, to the best knowledge of each Controlling Shareholder and the Company, is under investigation with respect to any violation of any provision of federal, state or other applicable law or administrative regulation which is likely to materially and adversely affect the properties, business, prospects, profits or condition (financial or otherwise) of the Company and its Subsidiaries, nor is there any basis for any of the foregoing. The Company and the Subsidiaries are in compliance with all applicable laws, except those of which a violation would not and, so far as each Controlling Shareholder can now foresee, will not, individually or in the aggregate, materially adversely affect the properties, business, prospects, profit or condition (financial or otherwise) of the Company and its subsidiaries.
US Trust then caused the ESOP to use the proceeds of a $70 million loan to purchase 3,589,743 F & G shares from the following shareholders:

 Purchase
Shareholder Shares Price
Stephen P. Bartley 11,974 $ 233,493.00
James B. Daken 23,948 $ 466,986.00
Lyle T. Dickes 100,000 $ 1,950,000.00
James N. Freid 19,158 $ 373,581.00
Dale Fujimoto 15,000 $ 292,500.00
William J. Gehring 53,571 $ 1,044,634.50
Henry R. Gregory, II 30,000 $ 585,000.00
John F. Halpin 14,369 $ 280,195.50
Richard S. Hodgson 20,814 $ 405,873.00
James H. Kyle 14,369 $ 280,195.50
John Lappegaard 30,000 $ 585,000.00
Gregory K. McAllister 11,974 $ 233,493.00
George McKittrick 5,000 $ 97,500.00
Michael F. Norbutas 45,336 $ 884,052.00
Robert A. Ostertag, Jr. 150,000 $ 2,925,000.00
Clayton Patino 19,229 $ 374,965.50
A. Robert Pellegrino 211,623 $ 4,126,648.50
Jerry L. Rathmann 53,571 $ 1,044,634.50
Frederick J. Stuber 64,285 $ 1,253,557.50
W. Thomas Stumb 10,000 $ 195,000.00
Mark Swedlund 50,000 $ 975,000.00
Leo A. Vandervlugt 42,857 $ 835,711.50
Robert J. Wilson 31,133 $ 607,093.50
Bruce B. Wright 69,643 $ 1,358,038.50
Steven Jay Regal Trust 33,000 $ 643,500.00
Judi Lynn Regal Trust 33,000 $ 643,500.00
John E. Regal Trust 33,000 $ 643,500.00
Ashley Anne Foster
 Irrevocable Trust 6,475 $ 126,262.50
Thomas S. Foster 1,698,502 $33,120,789.00
Melvyn R. Regal 687,912 $13,414,284.00

Each of these selling shareholders signed a written receipt for the purchase price.
Over the next few years, consumers and state attorney generals' offices continued to inquire into MBC's compliance with the law. On April 12, 1996, an Investigator with the Consumer Protection Division of the Michigan Attorney General wrote to Ostertag and advised that the office had received many complaints about MBC since early 1995. In July 1996, the Connecticut *880 Attorney General sued MBC as part of "Project Jackpot," a nationwide effort in conjunction with the Federal Trade Commission, to prosecute sweep-stakes and contest promoters accused of fraud. In 1997, MBC continued to respond to various states' inquiries into their sweepstakes. In October 1997, MBC entered into an Assurance of Discontinuance with the state of Michigan, agreeing to cease distribution of certain sweepstakes promotions after December 31, 1997. In January 1998, the Indiana Attorney General sent a civil investigative demand to MBC; that August, the Deputy Attorney General of the State of Indiana wrote MBC's sweepstakes counsel regarding a multi-state inquiry into MBC's use of sweepstakes promotions on behalf of Alabama, Arizona, Arkansas, Indiana, Kansas, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Texas, West Virginia, and Wisconsin. Also in August 1998, MBC entered into a Stipulated Settlement on the Connecticut suit which enjoined MBC from engaging in certain sweepstakes marketing practices in the state for a period of seven years and required MBC to pay $20,000.
Beginning in 1998, MBC's revenue bases suffered extensive damage as a result of the negative publicity targeting sweepstakes marketing. Over the next three years, MBC's gross revenues declined from $197 million in 1998, to $116 million in 1999, to $65 million in 2000. During the same time period, F & G also experienced a decline in gross revenues from $471 million, to $368 million, to $337 million.
In September 1999, Defendants Ostertag, Cole, Dix, and Elletson, members of the ESOP administrative committee, reported that on December 31, 1998, the value of the ESOP's F & G shares was $8.52 per share, as compared to the reported value of $20.33 per share on December 31, 1997. The total value of F & G shares owned by the ESOP decreased by more than $83 million in 1998, and the reported net value of ESOP assets, after deducting liabilities, decreased more than 90% from a net value of more than $82 million on December 31, 1997, to a net value of just over $7 million on December 31, 1998.
On April 6, 2001, Plaintiffs filed this suit. They bring their claims against numerous defendants pursuant to ERISA. Plaintiffs have now moved for summary judgment against Defendants Foster and Regal. The motion is fully briefed, and this Order follows.

DISCUSSION
Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir.1988).
If the moving party meets its burden, the non-moving party then has the burden *881 of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the nonmoving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir.1995).
Plaintiffs assert that Foster and Regal were fiduciaries to the ESOP and breached their duties as such by failing to disclose material information in connection with the 1995 ESOP transaction. A fiduciary is one who owes duties to the plan participants and beneficiaries; a fiduciary must exercise care, skill, prudence, and diligence in fulfilling those duties. 29 U.S.C. § 1104(a).
Under ERISA, an individual or entity can become a fiduciary in three ways: (1) being named as a fiduciary in the written plan instrument, 29 U.S.C. § 1102(a); (2) being named and identified as a fiduciary pursuant to a procedure specified in the written plan instrument, 29 U.S.C. § 1102(a)(2); or (3) meeting the definition of a fiduciary contained in 29 U.S.C. § 1002(21):
[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
29 U.S.C. § 1002(21)(A).
Here, Plaintiffs do not claim that Foster and Regal were named fiduciaries, but rather assert other bases for finding them fiduciaries with respect to the ESOP. They argue that Foster and Regal were fiduciaries of the ESOP because they exercised de facto control over the plan assets, because as members of the executive committee, they maintained control as to whether and on what terms the ESOP transaction would go through until the closing on December 20, 1995. Plaintiffs also rely on Newton v. Van Otterloo, 756 F.Supp. 1121, 1129 (N.D.Ind.1991), citing Leigh v. Engle, 727 F.2d 113, 134 (7th Cir.1984), for the proposition that the power to appoint and remove plan fiduciaries can also make members of a board of directors fiduciaries because it involves exercising discretionary authority or control over the management of the plan. Finally, Plaintiffs cite Eaves v. Penn, 587 F.2d 453, 459 (10th Cir.1978), for the proposition that an officer and director of a company who recommends, designs, and implements an ESOP transaction is an ERISA fiduciary.
Foster and Regal respond that their status as officers and directors of F & G does not in and of itself make them fiduciaries of the ESOP. In support of this position, they rely on Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc., 793 F.2d 1456, 1460 (5th Cir.1986), Confer v. Custom Engineering *882 Company, 952 F.2d 34, 37 (3rd Cir. 1991), Atwood v. Burlington Industries Equity, Inc., 1994 WL 698375 (M.D.N.C. 1994), and Cosgrove v. Circle K Corp., 884 F.Supp. 350, 353 (D.Ariz.1995). Specifically, they argue that neither one of them exercised any de facto informal or unofficial control over the management of the plan or its investment decisions. Respectfully, the Court disagrees.
Generally, ERISA ties fiduciary responsibilities to a person's actual authority, and therefore, that person is a fiduciary only "to the extent" that he or she exercises control or authority over the plan. Engle, 727 F.2d at 133.
For example, the board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise "discretionary authority or discretionary control respecting management of such plan" and are, therefore, fiduciaries with respect to the plan. However, their responsibility, and consequently their liability, is limited to the selection and retention of fiduciaries....
Id. at 133-34. Because Foster and Regal (and possibly others on the board) were undeniably fiduciaries with respect to the selection of U.S. Trust as successor trustee for the ESOP, the question here is not whether they were fiduciaries but how far their fiduciary duties extended.
A fiduciary responsible for appointing a plan trustee or administrator has "a duty to monitor appropriately" the actions of the appointed trustee or administrator. Engle, 727 F.2d at 135. Additionally, beyond this formal authority, the Seventh Circuit found that "ERISA directs courts to look beyond [the fiduciaries'] formal authority with respect to the plan, limited to selection and retention of administrators, and to consider what real authority they had over plan investments by virtue of their having appointed [the plan administrators.]" Id. at 135, n. 33. In that case, the court noted that by selecting the particular administrators that were selected, the fiduciary had obtained de facto control over plan investment decisions, which is functionally analogous to what happened here.
In their capacity as members of F & G's board and executive committee, Foster and Regal exercised control over the structure and orchestration of the ESOP transaction through the closing on December 20, 1995. They participated in conceiving the concept for the transaction, soliciting the valuation opinions from Valuemetrics, and setting up the structure of the stock purchase transaction. It is also no secret that Foster pushed for this transaction to be consummated. In October 1995, the F & G board adopted a resolution approving the concept of the proposed ESOP transaction and authorizing F & G's officers (including Foster and Regal) to take all steps necessary to complete the transaction and also authorizing the executive committee (again including Foster and Regal) to make changes and alterations to the transaction as they deemed necessary and proper. Acting through the executive committee, Foster and Regal authorized the Vice Chairman or any Vice President to execute and deliver documents necessary to consummate the transaction. Regal, on behalf of the executive committee, then appointed U.S. Trust to replace Magna Bank as trustee of the ESOP, apparently with the sole purpose of effectuating the stock purchase transaction, as Regal stated in his deposition that U.S. Trust had not been appointed as trustee prior to December 20, 1995, because there would have been no need to have U.S. Trust on board unless the ESOP transaction was going to go through. In other words, the selection of U.S. Trust as trustee for the *883 ESOP was so inextricably intertwined with the desired end of effectuating the stock purchase transaction that the act of appointing the trustee essentially exercised de facto control over the plans assets and management. Thus, the particular facts of this case make it readily distinguishable from the cases cited by Foster and Regal, as their actions clearly constituted the "something more" than the mere holding of a corporate office or appointment power found to be insufficient to bestow fiduciary status over the distribution of plan assets in those cases.
Accordingly, the Court finds that the scope of Foster and Regal's fiduciary duties was not limited merely to their appointment of U.S. Trust as the trustee of the ESOP and the corresponding duty of appropriate monitoring. As recognized in Engle, there are situations where the particular circumstances involved causes a fiduciary's liability to extend further than it might appear to extend on paper, and the Court concludes that this is one of those situations. While Defendants' invitation to look simplistically at the power to appoint as the end of the story is attractive, to do so would be elevating form over substance and ignore the Court's obligation to "look beyond" formal authority to the realities of the fiduciary relationship at issue. To hold otherwise would be to render the protections of ERISA meaningless, as ERISA's fiduciary liability provisions would have no meaning in the real world unless they are flexible enough to take cognizance of the different dynamics in which these transactions can occur.[2]
That being said, the question still remains whether Plaintiffs are entitled to summary judgment on their claim that Foster and Regal breached their fiduciary duty to disclose material information. Plaintiffs' motion is essentially based on Foster and Regal's answer to paragraph 212 of the Complaint. Essentially, Plaintiffs contend that Foster and Regal have admitted that "[t]he unanimous action by the Executive Committee on December 20, 1995, did not explain, discuss or evaluate, and Foster, Regal and Pellegrino did not otherwise adequately disclose, the operation of MBC's sweepstakes marketing, the nature and extent of consumer, attorney general and other complaints and inquiries that had been received in and prior to 1995, the unsavory nature of MBC's operations in 1995 and earlier that would serve as the basis for further consumer, attorney general and other complaints and inquiries in and after 1995, the full reasons for F & G's decision to close MMI, and other material information about F & G and MBC."
With all due respect, Plaintiffs make far too much of this admission. While this admission may constitute a portion of a puzzle that may ultimately be put together to establish liability, it does not in and of itself demonstrate a breach of fiduciary duty upon which partial summary judgment may be granted. All this admission establishes is that certain things were not disclosed during one action by the Executive Committee. It does not establish that these things were known by Foster and *884 Regal, that these things, if known, were not disclosed on some other occasion, or that these purported facts were actually material. Questions of this nature are plainly issues of fact involving assessments of credibility to be resolved at trial. Accordingly, to the extent that Plaintiffs seek summary judgment in this respect, their motion is denied.[3]

CONCLUSION
For the reasons set forth above, Plaintiffs' First Motion for Summary Judgment [# 269] is GRANTED IN PART and DENIED IN PART.
NOTES
[1] Note that the previous valuation was made on a minority interest basis, while the July 1995 valuation was made on a marketable controlling interest basis.
[2] Parenthetically, the Court notes the one paragraph argument by Foster and Regal that they could not be fiduciaries in any capacity because the ESOP transaction, as an amendment to an existing ESOP, was not a fiduciary transaction. This argument is not a fair application of the precedent cited, as those cases involved situations where a plan sponsor was taking action to modify or terminate an existing plan or other activities in connection with designing the plan, which is readily distinguishable from the case at bar. See Lockheed Corp. v. Spink, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); Hughes Aircraft Company v. Jacobson, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). Accordingly, the argument is without merit and warrants no further discussion.
[3] The remainder of Foster and Regal's brief argues that they did not breach any fiduciary duties owed, conceal information, or cause any loss. First, whether or not there was any breach is a fact intensive question not properly resolved at summary judgment. Moreover, these issues are not presented in Plaintiffs' Motion for Summary Judgment and therefore merit no further discussion at this time. Should Foster and Regal seek a ruling on a matter of law or undisputed question of fact prior to trial, they should file their own motion properly placing such issues before the Court.