**Joseph HENRY and Michael Malinky, Plaintiffs,**

v.

**CHAMPLAIN ENTERPRISES, INC., d/b/a CommutAir; Antony Von Elbe; John Arthur Sullivan, Jr.; Ernest James Drollette; Andrew Price; William L. Owens; Champlain Air, Inc.; and U.S. Trust Company of California, N.A., Defendants.**

**No. 01–CV–1681.**

United States District Court, N.D. New York.

Oct. 28, 2003.

**208**

Shayne & Greenwald Co., L.P.A., Attorneys for Plaintiffs, Columbus, OH, Gary D. Greenwald, Esq., Anne Marie La Bue, Esq., of counsel.

DeGraff, Foy, Holt–Harris & Kunz, LLP, Attorneys for Plaintiffs, Albany, NY, Terence J. Devine, Esq., of counsel.

Bond, Schoeneck & King, PLLC, Attorneys for Champlain Enterprises, Inc.; Champlain Air, Inc.; and all individual Defendants, Syracuse, NY, Edward R. Conan, Esq., Michael G. Langan, Esq., of counsel.

Groom Law Group Chartered, Attorneys for Defendant U.S. Trust Company of California, N.A., Washington, D.C., Edward A. Scallet, Esq., Robert P. Gallagher, Esq., Lars C. Golumbic, Esq., of counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiffs Joseph Henry and Michael Malinky (collectively "plaintiff"),[1] who are participants in defendant CommutAir's Employee Stock Ownership Plan ("ESOP"), brought suit against defendants (Champlain Enterprises, Inc., d/b/a CommutAir, Antony Von Elbe, John Arthur Sullivan, Jr., Ernest James Drollette, Andrew Price, William L. Owens, Champlain Air, Inc., and U.S. Trust Company of California, N.A.), alleging three causes of action: *Count One*—claiming breaches of fiduciary duties in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1104, 1105, 1106; *Count Two*—seeking removal of fiduciaries under the equitable relief provision of ERISA, 29 U.S.C. § 1109(a); and *Count Three*—claiming breach of fiduciary duty, unjust enrichment, and corporate waste and diversion of assets in violation of state law.

The following motions were filed and are pending: (1) plaintiff's and defendants' motions for partial summary judgment on *Count One* pursuant to Fed.R.Civ.P. 56, (Docket Nos. 52, 55, 63); (2) plaintiff's motion *in limine* pursuant to Fed. R. Evid. 104(a) and 702, (Docket No. 70); (3) plaintiff's motion to strike portions of certain affidavits and declarations submitted in support of defendants' motion for partial summary judgment, pursuant to Fed. R.Civ.P. 37(c)(1) and the parol evidence rule, (Docket No. 71); and (4) defendants' motion for bifurcation pursuant to Fed. R.Civ.P. 42(b), (Docket No. 54). Oral argument was heard October 3, 2003, in Utica, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

CommutAir is a company based in Plattsburgh, New York that offers regional airline service to cities in the northeastern and midwestern sections of the United

---

**1.** Plaintiffs Henry and Malinky assert *Count One,* under which all the pending motions are made, and *Count Two,* "on behalf of the ESOP as a whole." (Docket No. 27, ¶ 9.)

Thus, the singular "plaintiff" is used hereinafter to denote that plaintiffs Henry and Malinky bring suit on behalf of an entity, not for their own, individual benefit.

States. (Docket No. 65, ¶ 2; Docket No. 66, ¶ 3.) Prior to mid-March of 1994, the company was wholly owned by its founding members, defendants Anthony von Elbe ("von Elbe"), John Arthur Sullivan, Jr. ("Sullivan"), and Ernest James Drollette ("Drollette") (collectively "the sellers"), who all served on the board of directors. In late 1993, CommutAir and the sellers were investigating ways to raise more capital to expand its regional operation. At the same time, concern was expressed about employee retention and a desire was indicated to expand an already implemented employee profit-sharing program. To accommodate both goals, the sellers began exploring the possibility of establishing the ESOP and selling to it some of their shares of CommutAir stock. Defendant William L. Owens ("Owens")—who sat on the CommutAir board of directors, became aware of the proposed sale in late 1993, and was told that it would go forward in January of 1994—was to represent the sellers in the proposed transaction. (Docket No. 58, Ex. 5, p. 10; Docket No. 64, Ex. 5, pp. 34, 36.)

In late 1993 and early 1994, *a law firm*, Keck, Mahin & Cate ("KMC"), *a trust company*, defendant U.S. Trust Company of California, N.A. ("Trustee"), and *an appraisal firm*, Houlihan, Lokey, Howard, & Zukin, Inc. ("HLHZ"), were contacted by the company to discuss aspects of the proposed transaction. (Docket No. 58, Ex. 3, p. 67.) On January 4, 1999, in a letter addressed to seller Sullivan, in his capacity as CommutAir president, KMC offered its services to the Trustee and ESOP in connection with the proposed transaction. (Docket No. 80, Ex. 11.)

Defendant Andrew Price ("Price")—who became aware of the proposed transaction in January of 1994—was asked by one or more of the sellers to prepare management projections of the company's future financial performance to be used in connection with the sale. He was made aware that the projections would be used by HLHZ in its appraisal of the company. (Docket No. 79, Ex. 4, pp. 35–36.) He had never before prepared projections for use in such valuations, though he had prepared income projections on prior occasions. *Id.* at 166. Price could not recall if he had been or was subsequently in communication with HLHZ regarding the projections, *id.* at 36, though HLHZ claims to have had at least three or four meetings with him discussing the topic, (Docket No. 58, Ex. 4, p. 111.) Price claims, however, that no input on the projections was received from HLHZ. (Docket No. 79, Ex. 4, p. 134.)

For the projections, dated January 5, 1994, Price used actual operating results from the company's performance from 1992 through October of 1993. *Id.* at 127–28. The years 1990 and 1991 were not used allegedly because of the "growth period" CommutAir experienced in 1992 and 1993. *Id.* at 129–20. The projections essentially forecasted significant increases in projected revenue, operating profits, and pre-tax profit. *Id.* at 133. An allegedly revised set of projections was issued on January 17, 1994, though Price could not recall making the document. *Id.* at 134–35. Plaintiff claims the revision was necessary to correct the projections in light of financial information from the remainder of 1993 that stood in contrast to the increases projected by Price. The company's actual financial results for the years in the projection period did not attain the levels forecasted by the projections. Price could not recall any information coming to his attention between January 17, 1994, and March 30, 1994, the projected date of closing for the transaction, that would have affected his projections. *Id.* at 168. On January 17, 1994, HLHZ sent a letter to the trustee regarding the transaction.

By letter dated January 19, 1994, addressed to Trustee representative Norman Goldberg ("Goldberg") from seller Sullivan, the general terms of the proposed transaction were outlined. The next day, on January 20, 1994, the law firm, KMC, sent a memorandum to Goldberg, representatives from HLHZ, sellers Sullivan and von Elbe, and Price, summarizing issues that had been discussed at a meeting the week before. The general terms of the proposed transaction were again outlined, including the sellers "anticipat[ion] that the size of the transaction will be $60 million, as they believe[d] that COMMUTAIR [was] worth at least $200 million." (Docket No. 81, Ex. 27.) The sellers' opinion of the company's value was apparently based on discussions it had in the months and, perhaps, years prior to 1994 with "quote, unquote investment bankers" regarding possible mergers in which CommutAir was valued from $150 million to $250 million. (Docket No. 58, Ex. 4, p. 53; Docket No. 64, Ex. 1, pp. 20–21.) No independent analysis was done by the company to arrive at the $60 million proposed purchase price. (Docket No. 64, Ex. 1, p. 82; Id. at Ex. 5, p. 35; Docket No. 79, Ex. 4, pp. 218–20.) The KMC-authored letter opined that a number of steps would have to be undertaken prior to the closing on the transaction, which was "tentatively scheduled for March 15[, 1994]." (Docket No. 81, Ex. 27.) The desire was expressed to have this completed "by the end of February (and hopefully sooner)[.]" Id.

First, the sellers had to finalize their initial offer. (Docket No. 64, Ex. 6.) Defendants claim the above letter written to the Trustee dated January 19, 1994, was the initial offer. In that letter, written to Goldberg from seller Sullivan, the sellers "propose[d] to sell to an employee stock ownership plan to be formed ("ESOP") not less than thirty (30%) of the outstanding stock of [CommutAir] for a total purchase price of $60,000,000." (Docket No. 60, Ex. A.) The sellers indicated their anticipation that the purchase would be financed through two loans—a cash loan from CommutAir for a fraction of the purchase price, to be used as a down payment, and promissory notes issued to the sellers for the remainder of the purchase price. Id. The loans were to be secured by the stock being purchased. The stock sold would comprise a yet to be formed class of convertible preferred stock that was to issue to the sellers just prior to the sale. The stock would pay a cumulative dividend of "6%–7%," the proceeds of which would be used, along with mandatory contributions to the ESOP from CommutAir, to pay down the indebtedness on the loans. Id. No independent appraisal or investment banking firm was used to value the company and come up with the terms of the offer. (Docket No. 58, Ex. 5, p. 61.)

Then, per the January 20, 1994, memorandum, the law firm (KMC) and the appraisal firm (HLHZ), on behalf of the Trustee, had to conduct a due diligence investigation of CommutAir to determine the fairness of the offer. This investigation involved engaging independent contractors to prepare an appraisal and/or fairness opinion on the proposed transaction by visiting the company, interviewing management, and reviewing CommutAir's financial and other records. Id., Ex. 3, pp. 40–42. Assuming no issues arose regarding the value of the company during such investigation, KMC and HLHZ were to advise the Trustee on the fairness of the offer presented.

On January 26, 1994, CommutAir's board of directors, which included the sellers, officially hired the Trustee to be the sole representative of the ESOP in its purchase of the convertible preferred stock. (Docket No. 65, ¶¶ 3–4.) Around the same time, the Trustee retained KMC

as legal counsel for the ESOP. (Docket No. 60, ¶ 2.) About a week later, HLHZ sent an engagement letter to seller Price, asking that all three original copies of the engagement be sent to the Trustee, who would then return a copy to CommutAir for its records. HLHZ was to act as the plan's financial advisor. The engagement letter was signed by a CommutAir representative on February 9, 1994, but was not signed by the Trustee until February 14, 1994, ten days after it was written.[2] (Docket No. 58, Ex. 4, p. 26.) The letter noted that Price and an HLHZ representative "expect[ed] to derive preliminary valuation conclusions within the next 7–10 days." (Docket No. 64, Ex. 8.) By this time, the Jan 5 and/or Jan 17 management projections were presumably in the possession of HLHZ.

In February of 1994, "fare wars" broke out among the airlines, resulting in slashed ticket prices. HLHZ was aware, at the very least, that a CommutAir competitor had entered the market and was reducing ticket prices. (Docket No. 58, Ex. 4, p. 112.) The competitor's program slashing ticket prices lasted six months. (Docket No. 79, Ex. 4, p. 178.) Price was also aware of the fare wars. *Id.* at 172–73. Despite what plaintiffs claim are the negative impacts such wars had or would have on CommutAir's financial performance, neither Price nor any other member of the company's management submitted adjusted financial projections to the appraisal firm. Price contends that he did not revise the projections because, from his experience in the airline industry, fare wars are a "short-lived phenomenon." *Id.* at 176. In his view, the competitor's slashing of ticket prices was "simply an action by a carrier that was trying to promote new business and it may or may not succeed." *Id.* at 177.

By letter dated March 7, 1994, HLHZ presented to Goldberg its first draft in connection with the proposed transaction. (Docket No. 58, Ex. 4, p. 29.) In early March, the Trustee spent "considerable time" going over the appraisal firm's initial "valuation." *Id.* at Ex. 3, p. 79; *see also id.*, Exh. 6, p 54. Representatives of the Trustee also spent time reviewing the management projections Price provided to HLHZ. *Id.; see also id.*, Ex. 6, pp. 44–45.

On March 10, 1994, HLHZ sent to the Trustee a fax concerning events that were material or potentially material to the appraisal firm's work on the proposed transaction. *Id.*, Ex. 6, pp. 69–70. Among the issues addressed in the fax was the fare wars. *Id.*

Defendants claim the initial offer by the sellers was rejected. (Docket No. 60, ¶ 3.) According to Goldberg, after the ESOP legal counsel provided him with a draft sheet of certain terms he hoped to incorporate into the transaction, (Docket No. 59, ¶ 5), negotiations were undertaken with CommutAir to enhance the value of the proposed stock, (Docket No. 58, Ex. 3, p. 78.) These negotiations mainly pertained to the dividends to which the stock was entitled, and eventually resulted in alterations favorable to the ESOP. There is no evidence the purchase price was ever directly discussed as part of the negotiations.

In March of 1994, after completion of its due diligence obligations, HLHZ submitted to the Trustee an "Opinion Memoran-

---

**2.** As noted, HLHZ apparently began work on the proposed transaction as early as December of 1993. A representative of the firm, however, asserted that it was not unusual to begin working for a client prior to the signing of an engagement letter "if there is an agreement in principal as to the terms of the letter and if there is time pressures [sic] to meeting certain deadlines." (Docket No. 58, Ex. 4, p. 26.)

dum." (Docket No. 81, Exh. 17.) In the document, the appraisal firm states that it "relied upon and assumed, without independent verification, that the financial forecasts and projections provided to [it] ha[d] been reasonably prepared and reflect[ed] the best currently available estimates of future financial results and condition of [CommutAir], and that there ha[d] been no material adverse change in the assets, financial condition, business or prospects of [CommutAir] since the date of the most recent financial statements made available to [it]." *Id.* The letter went on to note that HLHZ "ha[d] not independently verified the accuracy and completeness of the information supplied to [it] with respect to [CommutAir] and d[id] not assume any responsibility with respect to it. [It] ha[d] not made a complete physical inspection or any independent appraisal of any of the properties or assets of [CommutAir]. [Its] Opinion [wa]s necessarily based on business, economic, market and other conditions as they exist[ed] and c[ould] be evaluated ... at the date of th[e] letter." *Id.* The two main valuation methodologies used by HLHZ were the market capitalization approach[3] and the discounted cash flow method.[4] Despite finding the total equity value of the company to be $174 million—and not the $200 million "anticipated" by the sellers— HLHZ determined that the proposed transaction was reasonably stated at $111.11 per share for a purchase price of $60 million because the value of the stock was increased by dividend rights and other features.

On March 15, 1994, the CommutAir board of directors, including the sellers, adopted resolutions recapitalizing the company, creating the new class of stock consisting of the soon to be sold convertible preferred stock, creating the ESOP and the trust agreement, and amending its certificate of incorporation to reflect these changes. (Docket No. 80, Ex. 26.) Previously, the sellers had owned all of the company's outstanding shares, which consisted of 180 shares of voting common stock. Per the amendment, the sellers were to surrender those shares in exchange for 1.26 million shares of common stock and 540,000 shares of convertible preferred stock. The sellers were then to

---

3. The aim of the market capitalization approach is to determine "a level of earnings which is considered to be representative of the future performance of the company, and capitalizing this figure by an appropriate risk-adjusted rate." (Docket No. 81, Ex. 17.) Five steps are undertaken when using this approach. First, the representative earnings levels that will be capitalized must be determined. Second, comparable but publicly traded companies must be selected for comparison. Third, a comparative risk analysis must be performed between the subject company and the comparable companies. Fourth, based on this analysis, market multiples must be selected and analyzed to obtain the capitalization rate. Finally, using all of the above and making any necessary adjustments, the value of the company must be determined.

4. The discounted cash flow method "estimate[s] the present value of the projected future cash flows to be generated from the business and theoretically available (thought not necessarily paid) to the capital providers of the company." (Docket No. 81, Ex. 17.) Five steps are undertaken when using this approach. First, appropriate cash flows to be discounted must be determined from the financial projections submitted by the company's management. Second, an appropriate discount rate must be selected for the projections based upon an analysis of alternative investments. Third, a terminal value must be derived to determine cash flows for the period of time after the management projection period into perpetuity. Fourth, the value of the company's total invested capital must be determined. Finally, the projected future cash flow and the terminal value must be discounted back to the present to yield an indication of the company's total equity value.

sell the 540,000 shares to the ESOP for $60 million, or $111.11 per share, after the convertible preferred stock was appraised and the transaction approved by the Trustee. As stated in the initial offer, the down payment of the purchase price was to be loaned to the ESOP from CommutAir, and the remainder of the purchase price was to be covered through the issuance of promissory notes to the sellers. The convertible preferred stock was to serve as security for the loan. Any dividends earned by the stock, and contributions made to the ESOP by CommutAir, would be used to pay down the loans. As the loans were paid down, shares would be released from collateral and placed either in an ESOP participant's account or paid to him or her directly.

That same day, March 15, 1994, a stock purchase agreement was signed by CommutAir, the sellers, and the Trustee. (Docket No. 60, Ex. F.) Per the agreement, the sellers agreed to sell the ESOP 540,000 shares of convertible preferred CommutAir stock for the purchase price of $60 million. The sellers collectively retained the 1.26 million issued and outstanding shares of CommutAir common stock. To facilitate the purchase, the ESOP made a $9 million down payment with a loan from CommutAir, to be paid back on a periodic basis with interest. For the remainder of the purchase price, the ESOP issued to the sellers promissory notes totaling $51 million in value, to be paid in installments with interest.

Section 5.7 of the purchase agreement provided for the following:

> In the event of a final determination by the Internal Revenue Service, the Department of Labor, a court of competent jurisdiction *or* otherwise that the fair market value of the shares of ESOP Convertible Preferred Stock as of the Closing is less than the Purchase Price,

then the Sellers, jointly and severally, shall pay to the [ESOP] an amount equal to the difference between the Purchase Price and said fair market value for such shares of ESOP Convertible Preferred Stock, plus interest at a reasonable rate from the date of Closing to the date of such payment. Such payment may be made either in cash, or in the form of shares, valued in accordance with their actual fair market value as of the Closing.

(Docket No. 27, First Amended Compl., Exh. A.) (emphasis added). Section 5.7 was drafted by the ESOP's legal counsel, KMC. Defendants claim that it was the intent of the ESOP legal counsel and Owens, representing the sellers, that the provision would serve as an alternative theory of recovery in the event that a court should determine that the purchase violated ERISA. (Docket No. 59, ¶ 7.) In other words, defendants argue the provision would only apply if the issue of the stock's actual fair market value at the time of the purchase was actually litigated and decided. (Docket No. 65, ¶ 6.)

Per the purchase agreement, an ESOP administrative committee was to be formed to, *inter alia,* supervise and monitor the Trustee and act on the ESOP's behalf. On the date of the purchase, no individual or entity was appointed to the ESOP administrative committee. The day after the purchase, in a special meeting of the CommutAir board of directors, a motion was made and carried to appoint Owens to the committee. (Docket No. 80, Ex. 13.) On April 8, 1994, seller Drollette signed a document entitling Owens to act alone on the ESOP's behalf. (Docket No. 53, Ex. A, Tab 5; Docket No. 65, ¶ 7.)

In 1996 or 1997, the Internal Revenue Service ("IRS") conducted an audit of CommutAir for the 1992 and 1993 tax years, and issued to it notices of deficiency.

The parties subsequently settled the claim in 1997, forcing the sellers, who in 1992 and 1993 were the only shareholders, to incur several million dollars in tax liability. In a November 1997 meeting of the CommutAir board of directors, on which all the sellers, along with Price and Owens, then sat, it was proposed that the company issue to the sellers promissory notes, totaling nearly six million dollars, to compensate them for the tax liabilities imposed on them as a result of the audit. (Docket No. 58, Ex. 7; Docket No. 65, ¶ 9.) Owens presented the proposal to the Trustee, who a few months later approved the issuance of the notes, contingent on the payment of a *pro rata* dividend to the ESOP. (Docket No. 65, ¶¶ 10–11.)

Meanwhile, in 1997 or 1998, the IRS conducted a second audit on CommutAir, this time for the tax years of 1994 through 1996, focusing specifically on the sale of the convertible preferred stock to the ESOP. On August 28, 1998, the IRS sent to the company a notice claiming an income tax deficiency in the amount of $3,767,157, and a penalty in the amount of $753,431.20, based on a disallowance of deductions taken for the company's contributions to the ESOP. (Docket No. 58, Ex. 9; Docket No. 65, ¶ 14.) A second notice, dated October 7, 1998, was sent to the company, claiming that, because the IRS found the fair market value of the stock purchased by the ESOP to be far below the purchase price, a first tier excise tax deficiency in the amount of $3 million dollars was owed for each of the years from 1994 to 1997. (Docket No. 58, Ex. 8.) The notice also claimed that if the company did not make a correction with respect to the transaction by paying to the ESOP the difference between the fair market value of the shares as determined by the IRS, which was $27 million, and the purchase price, which was $60 million, a second tier deficiency tax in the amount of $60 million

would be owed. *Id.* The notice also claimed that an additional total of $2.7 million was to be added to the company's taxes for the years covered by the deficiency. *Id.*

The deficiency notices were based on a report dated January 31, 1998, in which an IRS employee found that the methodologies used and eventual fair market value determined by the appraisal firm, HLHZ, were incorrect, and that the true fair market value of the stock purchased by the ESOP was well below the purchase price. (Docket No. 53, Ex. 19.) Specifically, he determined that the total equity value of the company was $90 million, and that the fair market value of the convertible preferred stock at the time it was purchased was $27 million, or $50.00 per share. He found HLHZ to be in error for, *inter alia,* not giving consideration to the lack of marketability of the stock issued to the ESOP, or for the large amount of stock still in possession of the sellers after the transaction. He also determined that some of the companies selected for comparison in the market capitalization approach were "unacceptable" because their size, revenue, book value and other financial elements placed them in "a totally different class of airlines." *Id.* He also found improper the use of the discounted cash flow method because of the use of a terminal value and because projecting future income and profits in CommutAir's case was "very difficult." *Id.*

CommutAir and the sellers referred the IRS report to Owens, the Trustee, and HLHZ for review. (Docket No. 65, ¶ 15.) The Trustee admits that it could have been sued if, as the IRS report indicated, it had allowed the ESOP to be overcharged for the purchase, but contends that any conflict of interest it may have had in reviewing the report was "more theoretical than real" and essentially "dissipate[d]" because

the flaws in the report were so fatal. (Docket No. 58, Ex. 3, pp. 324–26.) The flaws, according to Goldberg and the defendants, were three-fold: (1) that the IRS incorrectly assigned no value to the dividend rights attached to the stock; (2) that it used a valuation methodology incorrectly; and (3) that the IRS made statements concerning valuation methodologies that were contrary to accepted practice. (Docket No. 60, ¶ 11.; *see also id.* at Ex. B; Docket No. 59, ¶ 9, describing report as "seriously deficient and without merit"). Neither the Trustee nor Owens sought a second, independent opinion on the value of the convertible preferred stock. *Id.* at ¶ 12; *see also* Docket No. 65, ¶ 15. The Trustee communicated its beliefs to CommutAir, which then asked, through Owens, for the Trustee's assistance in defending the company's position. (Docket No. 58, Ex. 3, pp. 357–58).

On November 24, 1998, CommutAir and the sellers, believing the IRS to be in error, filed a protest with the United States Tax Court on both of the deficiency notices issued to it in 1998. (Docket No. 60, Ex. C.) Thereafter, in late 1998 through early 1999, Owens engaged in discussions with the IRS, (Docket No. 65, ¶ 16), while Price, who was appointed to the ESOP administrative committee in January of 1999, (Docket No. 66, ¶ 10), served as the point of contact for the agency auditor, *id.* at ¶ 10. By the spring of 1999, Owens notified the Trustee and the ESOP legal counsel that the IRS was interested in settling the matter, because, according to Owens, "[i]t became apparent ... that the IRS'[s] concern was not the value of the stock, but the level of deductibility of the company's contributions to the ESOP which were substantially in excess of the generally applicable IRS limits because of the large benefits for the CommutAir employees relative to their compensation." (Docket No. 65, ¶ 16.) He claims

that the company and the IRS eventually agreed that a 15% reduction in the level of deductibility and a modest penalty represented an appropriate disposition of the matter. *Id.*

In January of 1999, after becoming aware of the IRS investigation, plaintiff Henry, an employee of CommutAir and ESOP participant, asked Price for a copy of HLHZ's 1994 appraisal, (Docket No. 80, Ex. 22, p. 68), with the alleged intent of obtaining an unbiased opinion concerning the "financial integrity" of the appraisal, *id.* at 84. His request was denied, and neither plaintiffs Henry and Malinky nor any other ESOP participant received a copy of the appraisal until discovery in the instant case. *Id.* at 292.

Shortly thereafter, on January 21, 1999, Price, on behalf of the board of directors, sent a memorandum to CommutAir employees. (Docket No. 80, Ex. 25.) In the memorandum, the IRS investigation and resulting deficiency notice were deemed "completely unfounded." *Id.* In support, the memorandum alleged that the dispute was over a "technical financial issue" on which the company had done more work than the IRS on the issue, and outlined the qualifications of the Trustee, KMC, and HLHZ. *Id.* Price could not recall whether, in referring to the dispute as being over a "technical financial issue," he meant that the IRS was pursuing a "technicality" or that the issue concerned the technical aspects of a financial issue. (Docket No. 79, Ex. 4, p. 18.) Price testified at his deposition that, by asserting that the IRS had not put in as much effort as the company, he was speaking of HLHZ's effort. *Id.* at 38. Regardless, the memorandum opined that the situation presented "a case of 'assess as much as you can, and see what sticks.'" (Docket No. 80, Ex. 25.) The memorandum further opined that "the incomplete and hap-

hazard effort put together by the IRS represents taxpayer harassment" and promised to "seek remedy" under "recent revisions to the Tax Code" that allegedly prohibited the same. *Id.* There is no evidence such a remedy was sought.

On September 27, 1999, the Tax Court entered decisions stipulated to by the parties which settled the dispute with respect to both deficiency notices. (Docket No. 79, Ex.7.) According to the decision entered on the August 28, 1998, deficiency notice, the deficiency in income tax for 1994 was reduced to $598,843, and it was agreed that CommutAir would incur additions to its taxes in the amount of $59,884. (Docket No. 60, Ex. E.) According to the decision entered on the October 7, 1998, deficiency notice, it was agreed that CommutAir was deficient in first-tier excise taxes in the amount of $373,500 plus interest, (Docket No. 79, Ex. 7), which was later determined to be $80,281.25. It was also agreed that no second-tier taxes were owed, and that there would be no additions to the company's income tax for the tax years ending 1994 through 1997. *Id.* By decisions entered the same day, it was determined that each seller owed excise taxes for the taxable years ending 1994 through 1997 in the amount of $124,500, with no second tier taxes or additions to income tax. *Id.* It appears all of these stipulated amounts were calculated on the basis of a $51 million transaction.

After the settlement, Owens claims meetings were held with the Trustee and KMC, the law firm, to determine what course of action, if any, would be taken as a result of the settlement. The IRS engineer's report that formed the basis of the deficiency notices was referred to HLHZ, the appraisal firm, for evaluation. Defendants allege that an investigation was undertaken into whether to pursue payment from the sellers pursuant to Section 5.7,

but that it was determined that no viable claim existed. The Trustee claimed that the settlement did not mean that an agreement had been reached that the purchase price should have been $51 million. Rather, as Goldberg claims, "I understood that going forward, the company could only deduct interest [from its contributions to the ESOP used to pay off its debts] based on a purchase price of $51 million. I never understood it to be an adjustment of the purchase price." (Docket No. 58, Ex. 3, p. 405; *see also id.,* Ex. 5, pp. 180–81: "The agreement was reached that we would, for purposes of IRS alone, treat the question of calculation of interest deductions based upon the $51 million value. We did not reach an agreement that the value was $51 million"; Docket No. 79, Ex. 4, p. 38.) According to Owens, there was no agreement between the IRS and CommutAir as to the fair market value of the stock at the time it was purchased; if the agency had proposed it, he claims he would have rejected it "because [he] knew that the IRS did not have an independent valuation and that it did not want to pay for one." (Docket No. 65, ¶ 16.) The ESOP legal counsel adds that in the stipulated decisions, there is no admission of wrongdoing or error with respect to the valuation, and no reference to a correction of any overcharge. (Docket No. 59, ¶ 12.) Consequently, neither the trustee nor Price nor Owens demanded that the company reduce the original sale price or that the sellers reimburse the ESOP for the difference between the purchase price ($60 million) and the $51 million (the calculation basis for the IRS settlement).

## III. PLAINTIFF'S CLAIMS AND RELIEF SOUGHT

On November 1, 2001, plaintiff filed suit against defendants. (Docket No. 1.) On February 21, 2003, it filed a First Amended Complaint, alleging three Counts.

(Docket No. 27.) In *Count One*, plaintiff appears to allege four separate breach of fiduciary claims against defendants. Specifically, it is alleged that fiduciary duties were breached in: (1) permitting the ESOP to be overcharged for the purchase of the convertible preferred stock from the sellers; (2) permitting the ESOP to engage in a transaction prohibited by ERISA; (3) failing to pursue and demand payment from the sellers pursuant to Section 5.7 after the September 1999 settlement with the IRS; and (4) failing to monitor, supervise, and/or remove certain parties from their fiduciary capacities. Plaintiff claims the sellers individually, as ESOP fiduciaries, are responsible for the first and third alleged breaches; the Trustee, as an ESOP fiduciary, is responsible for the first three alleged breaches; Owens, as a *de facto* ESOP fiduciary or an ESOP co-fiduciary, is responsible for all four alleged breaches; Price, as an ESOP co-fiduciary, is responsible for all four alleged breaches; and CommutAir, as an ESOP fiduciary, is responsible for the fourth alleged breach.

For relief, plaintiff seeks to have the sellers, the Trustee, Price, and Owens restore any losses to the ESOP caused by the breaches of fiduciary duty, and, as to the sellers alone, as parties in interest to a prohibited transaction, plaintiffs seek a disgorgement of profits in the amount of $9 million that they allegedly received as a result of the stock purchase.[5]

*Count Two* seeks an order removing the Trustee as ESOP trustee, and Price and Owens from their positions on the ESOP administrative committee. *Count Three* asserts only state law claims against Price, Owens, the sellers, and defendant Champlain Air, Inc. While only the claims in *Count One* are implicated in the pending motions, discussion of *Count Three* and comment on *Count Two* are appropriate. *See infra.* Do not mistake this lengthy opinion as resolving any terribly difficult questions of law, for none exist. Rather, attribute the extended discussion to an effort to clarify precisely the claims and issues to be resolved at trial, and those that have no merit.[6]

---

**5.** The $9 million figure is a result of plaintiffs' contention that the fair market value of the stock purchased was $51 million, or, $9 million less than the purchase price of $60 million.

**6.** This statement should not be misidentified as an apology for the opinion's length, for the parties' memoranda of law alone in the pending motions collectively total over 200 pages. The multiple declarations, affidavits, and exhibits thereto would at least double that figure. The First Amended Complaint is 118 paragraphs in length, complete with several subparagraphs. It is confusing and *Count One* fails to set forth specific claims against specific defendants. Rather, it lumps all of the named defendants in all claims. After much effort, it was finally discovered that plaintiff is *apparently* alleging four separate causes of action within *Count One*, some of which could only be applicable to certain defendants. This is not, however, spelled out with any clarity in the First Amended Complaint. As a result, this decision refers to the four "bases" of *Count One*.

Approaches like the one taken by plaintiff here force district courts to spend enormous amounts of time and energy sifting through lengthy pleadings and motion papers. However, the hope of all tribunals is that such sifting is only to be done when truly necessary, lest the bar begin to take the court's patience and resources for granted. Despite these truths, which were once believed to be self-evident, convincing attorneys to focus on only the most viable claims or defenses is a mountain difficult to climb. Nevertheless, this footnote is hereby declared to be an invitation to the lawyers practicing in the Northern District of New York to take advantage of an already existing opportunity (and obligation) to grease the wheels of justice through concise allegations of only valid claims and defenses. Slough off fears of losing or malpractice suits by investing the time to research potential claims and defenses. It is

## IV. DISCUSSION

There are several motions pending, the most prominent of which are plaintiff's and defendants' motions for "partial" summary judgment on *Count One*. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut*, 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

### A. Duties of an ERISA Fiduciary

■ "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). To that end, the statute imposes upon fiduciaries of benefit plans certain duties when acting on behalf of the plan. Where, as here, the plaintiff's allegations amount to a claim that the alleged fiduciaries have sacrificed the interests of the plan's beneficiaries in favor of those of non-beneficiaries, "the strict prudent person standard" found in Section 1104(a), and not the arbitrary and capricious standard, is employed when adjudging the fiduciaries' actions or inaction. *See John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir.1994). Section 1104(a) has been described by the Second Circuit as mandating the following: " '[a] fiduciary must discharge his duties solely in the interests of the participants and beneficiaries. He must do this for the exclusive purpose of providing benefits to them. And he must comply with the care, skill, prudence, and diligence under the circumstances then prevailing of the traditional prudent man.' " *Devlin v. Blue Cross and Blue Shield*, 274 F.3d 76, 88 (2d Cir.2001) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.1982) (Friendly, J.) (internal quotations and citation omitted)). This "strict" standard, derived from the law of trusts, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 152–53, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), has been described as " 'the highest known to law.' " *Flanigan v. General Elec. Co.*, 242 F.3d 78, 86 (2d Cir.2001) (quoting *Donovan*, 680 F.2d at 272 n. 8); *see also Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984) (stating that duty "imposes [upon] fiduciaries an unwavering duty . . . to make decisions with single-minded devotion to a plan's partici-

only then—when the debris and smoke are cleared—that valid claims and defenses will find the road to justice sooner.

pants and beneficiaries"). Thus, the duties delineated in Section 1104(a) "must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve participants in the plan." *John Blair*, 26 F.3d at 367.

Plaintiff claims in *Count One* that defendants breached their fiduciary duties under ERISA. As noted, this claim appears to have four primary bases: (1) that defendants breached their fiduciary duties in permitting the ESOP to purchase the stock from the sellers at an allegedly inflated price; (2) that defendants breached their fiduciary duties in permitting the ESOP to engage in a transaction prohibited by ERISA; (3) that defendants breached their fiduciary duties in failing to pursue payment from the sellers of the difference between the purchase price and the fair market value pursuant to paragraph 5.7 of the stock purchase agreement, after CommutAir and the sellers settled the dispute over the second audit with the IRS; and (4) that defendants breached their fiduciary duties in failing to monitor, supervise, and/or remove the Trustee, Price, and Owens from their fiduciary positions. Each basis will be discussed inasmuch as it is relevant to disposition of the summary judgment and other pending motions.[7]

### B. Basis One: Permitting the Alleged Overcharge

■ The first basis for *Count One*, that it was a breach of fiduciary duty to permit

the ESOP to purchase the stock from the sellers for $60 million, focuses upon the actions and knowledge of the fiduciary or fiduciaries before and at the time of the purchase. The parties do not seem to dispute that whether a breach of fiduciary duty occurred—i.e., "whether the [fiduciary], at the time [it] engaged in the challenged transaction[ ], employed the appropriate methods to investigate the merits of the [transaction] and to structure the [transaction]," *Flanigan v. General Elec. Co.*, 242 F.3d 78, 86 (2d Cir.2001)—presents questions of fact in need of resolution at trial. However, they do dispute whether defendants should be permitted to offer the testimony and report of Robert Dana ("Dana") that is arguably relevant to one of the issues that will be considered in determining whether a breach occurred— the actual fair market value of the convertible preferred stock on the purchase date. In the event it is found that permitting the transaction to occur was a breach of fiduciary duty, the parties also dispute whether the sellers, Price, and Owens can be held responsible therefor. Thus, while adjudication of the actual merits of this part of *Count One* is reserved for trial, plaintiffs' motion *in limine* and Price's and Owen's motions for partial summary judgment are properly before the court and in need of determination.

#### 1. Motion to exclude

■ Plaintiff has moved to exclude the testimony and report of defendants'

---

**7.** The pleadings and voluminous motion papers did little to decipher what "parts" make up *Count One* or which "part" of *Count One* is the subject of the "partial" summary judgment motions. Thankfully, an extensive review of the facts, coupled with a long-desired attempt at illumination at oral argument by the parties, indicated that plaintiff and defendants sought summary judgment on the third basis of *Count One*, while Price and Owens separately sought the same on the first base of Count One. Also sufficiently asserted at oral argument and in the moving papers is a summary judgment motion by Price and Owens on the second and fourth bases of *Count One*, a summary judgment motion by CommutAir on the first three bases of *Count One*, a partial summary judgment motion by CommutAir on the fourth basis, and a summary judgment motion on behalf of the sellers on the first three bases for *Count One*. Making such inferences is most proper in this case because it is somewhat difficult to determine what, precisely, plaintiff is alleging.

valuation expert, Dana, from being presented and admitted as evidence at trial. Expert testimony is only admissible if it is both: (1) relevant and (2) reliable. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). An expert opinion is "relevant" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. Here, because Dana's report and testimony purport to aid in the determination of the fair market value of the convertible preferred stock at the time it was purchased—an issue certainly germane to whether it was a breach to permit the ESOP to engage in the transaction—it cannot be excluded on the basis that it is irrelevant. The only question remaining, therefore, and the one to which plaintiff directs its motion *in limine,* is whether Dana can offer reliable testimony and evidence.

■ Plaintiff's motion to exclude Dana's report and testimony as unreliable is premised on two overall arguments—that he is unqualified to render an opinion in the specific area of an ESOP transaction, and that his methodologies were flawed. Defendants admit that his qualifications to render an opinion on the value of the stock purchased by the ESOP are not based on specific educational background or topical publications. Rather, defendants claim he is qualified on the basis of his years of experience as a banker who has performed valuations on Wall Street for fifteen years.

An expert's opinion may be based on experience alone so long as the expert "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702, Advisory Committee Notes (2000 Amendments). However, "[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Bunt v. Altec Indus., Inc.,* 962 F.Supp. 313, 317 (N.D.N.Y. 1997) (quoting *Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 226 (N.D.N.Y. 1994), *aff'd,* 101 F.3d 682, 1996 WL 170209 (2d Cir.1996)); *see also* Fed.R.Evid. 702, Advisory Committee Notes (2000 Amendments) (stating that "[a] review of the case law after *Daubert* shows that rejection of expert testimony is the exception rather than the rule"). "Accordingly, assuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Canino v. HRP, Inc.,* 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) (citations omitted).

While some measure of wariness is indeed expressed as to Dana's qualifications, it is here found, certainly at this stage of the proceedings, that his experience in the financial/securities field is sufficient. He has a degree in economics from Yale, and an MBA from Columbia. He has prepared or assisted in the preparation of several valuations, including at least some where an ESOP was involved. As noted, the fact that his experience is not exclusively or largely devoted to valuing stock on behalf of a purchasing ESOP is not enough to exclude his testimony. Plaintiff may take issue with his qualifications on cross-examination. *Id.* at 28 ("The Second Circuit has held that 'quibble' with [a] proposed expert's training or knowledge on specific points may be properly explored on cross-examination at trial") (citation omitted).

■ With respect to the methodologies used by Dana in his expert report, plaintiff argues that the use of a software

program, the use of certain specific tools in the valuation methodology (such as the optimal capital structure and certain pricing multiples), and the failure to account for the impact of the fare wars, render Dana's opinion unreliable. However, the use of his methodologies in general, especially the discounted cash flow method, is accepted,[8] and, in any event, "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony," *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995); *see also Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*, 217 F.Supp.2d 311, 318 (N.D.N.Y.2002). In the bench trial, it will be the duty of the court to assess and weigh his credibility. *See Katt v. City of New York*, 151 F.Supp.2d 313, 351 (S.D.N.Y.2001). Plaintiff may aid in the performance of this duty at trial through "[v]igorous cross-examination [and the] presentation of contrary evidence[.]" *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786; *see also McCullock*, 61 F.3d at 1043–44. "On cross-examination counsel may probe the witness's qualifications, 'experience, and sincerity; weaknesses in the opinion's basis, the sufficiency of assumptions, as well as the strength of the opinion.'" *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F.Supp.2d 320, 324 (E.D.N.Y.2001) (quoting Michael H. Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness*, 1986 U. ILL. L. REV. 43, 69–71 (1986)).

It is also important to note that, with respect to these issues, Dana will be presenting his testimony in the context of a bench trial, and this judge is quite confident in his ability to separate the wheat from the chaff, so to speak, on the valuation issue. Plaintiff's motion to exclude Dana's testimony and report must be denied without prejudice to renew at trial.

### 2. *Responsibility for breach*

■■ Assuming for the sake of argument that it was a breach of fiduciary duty to allow the ESOP to purchase the stock from the sellers, there is no question that the Trustee, as the entity charged with representing the ESOP in the transaction, would be liable for the breach. Plaintiff also claims, however, that Price and Owens, through concealment or misrepresentation, are liable for the alleged breach, on the bases that Owens is a *de facto* fiduciary, and that both are co-fiduciaries under 29 U.S.C. § 1105.

#### a. *Owens as a "de facto" fiduciary*

■■ Plaintiff argues that because no one was appointed to the ESOP administrative committee the day of the transaction, there was no one supervising the Trustee in its representation of the ESOP in the transaction. Because, argues plaintiff, the power to appoint the Trustee and other fiduciaries was vested in the CommutAir board of directors, that supervising responsibility fell to all board members, including Owens, on the day of the transaction. In support of this proposition— that by virtue of membership on the appointing committee, Owens was a fiduciary with respect to the transaction—plaintiff cites *Keach v. U.S. Trust Co., N.A.*, 234 F.Supp.2d 872 (C.D.Ill.2002). In *Keach*, the court held that a company's executive

---

**8.** *See, e.g., Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y.2003) ("Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method") (citing

*Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186 (7th Cir.1993); SHANNON P. PRATT ET AL., VALUING A BUSINESS: THE ANALYSIS & APPRAISAL OF CLOSELY HELD COMPANIES 154 (4th ed.2000)).

board members were *de facto* fiduciaries because they were responsible for monitoring and supervising the appointed trustee. *Id.* at 882–83. The court noted that the board members' fiduciary status, however, went further than merely appointing the trustee because "the selection of U.S. Trust as trustee for the ESOP was so inextricably intertwined with the desired end of effectuating the stock purchase transaction that the act of appointing the trustee essentially exercised de facto control over the plans['] assets and management." *Id.*

■■■ Under ERISA, a person is a fiduciary "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets, . . . or (ii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) and (iii). Though this definition will be "broadly construed," whether a party is a fiduciary requires a "functional" inquiry. *See LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir.1997). To the extent that Owens retains fiduciary status for his role in voting for the appointment of the Trustee, plaintiff has no cause of action, as they neither allege negligence in the hiring of the Trustee, nor is there any evidence such a decision in this case would give rise to a breach of fiduciary duty.

With respect to the *Keach* decision, it is initially noted that this holding, if cited in the manner plaintiffs refer to it, may reap incurable conflicts of interest and effectively paralyze the sale of stock to employees of closely held corporations. For example, generally following the court's reasoning, seller defendants Sullivan, von Elbe, and Drollette, in their capacities as CommutAir directors, could be ESOP fiduciaries at the same time they sat across the table from the ESOP as sellers. Clearly, this result is envisioned by neither Congress nor the court in *Keach.* Rather, in *Keach,* the executive board members under consideration were very active in the entire process, thus leading the court to conclude that their *conduct,* not their *status* alone, fit the statute's functional fiduciary definition. Here, plaintiff has presented no evidence pre-dating the transaction that Owens was an influencing presence, much less a discretionary authority, on the ESOP or Trustee's valuation of the stock or decision to go forward with the purchase. He was involved in the *negotiations and transaction* not in his capacity as a board of directors member, but instead as the designated legal counsel for the sellers. Thus, all that is left as evidence of Owens's fiduciary status with respect to the transaction is his *status* as a member of the board of directors. Without more, namely, *conduct* amounting to discretionary control or authority, Owens cannot be considered a fiduciary with respect to the alleged overcharge.

This should not be taken as a rejection of plaintiff's argument that some individual or entity was responsible for monitoring and supervising the Trustee in its investigation relative to the purchase of the convertible preferred stock. Such monitoring and supervision, however, did not fall to Owens as an individual, an ESOP administrative committee member, or even as an individual on the CommutAir board of directors. Rather, such monitoring and supervising duties fell to CommutAir, and its alleged failure to do the same, and to remove the Trustee from its position as ESOP fiduciary, is addressed in the fourth basis of *Count One. See infra.*

### b. *Price and Owens as co-fiduciaries*

■■■ A more compelling, but ultimately unsuccessful, argument is that Price and

Owens were co-fiduciaries for the alleged overcharge because they allegedly concealed or misrepresented the overcharge after the date of the transaction. Under 29 U.S.C. § 1105(a), a person may incur co-fiduciary liability if: (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach"; (2) "he has enabled such other fiduciary to commit a breach"; or (3) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

Plaintiff cites a laundry list of allegations that purportedly demonstrate Price's and Owens's knowing participation in or concealment of the alleged breach. (Docket No. 76, pp. 10–13.) It is true that Section 1105(a) may only be invoked against a fiduciary. *See Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 103–04 (2d Cir.1998) ("Under 29 U.S.C. § 1105(a), a *plan fiduciary* shall be liable for a breach of fiduciary responsibility of another fiduciary . . .") (emphasis added); *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir.1993) (recognizing distinction between liability as "co-fiduciary" under Section 1105 and non-fiduciary under common law).[9] As defendants point out, many of the allegations made by plaintiff relate to events that pre-date Owens's and/or Price's appointment as fiduciaries. However, their alleged knowing participation in and concealment of the alleged breach cannot be viewed in a vacuum. Any alleged knowledge or action taken prior to appointment does not evaporate. In other words, Price and Owens still know what they knew before. The only difference is that, upon appointment to the ESOP ad-

ministrative committee, they "knew" as fiduciaries.

With respect to Price, plaintiff claims his knowing participation in and/or concealment of the breach arose from: (1) his failure to submit adjusted management projections, or to cause HLHZ to modify its valuation, despite knowledge of the February 1994 fare wars; (2) his failure to cause HLHZ to modify its valuation despite his knowledge of the fare wars and his knowledge that the growth rate used by the appraisal firm in calculating was unreasonably high; (3) his post-transaction representation of the company's total equity value to ESOP participants, despite his alleged knowledge that such representation was overstated by more than $100 million; (4) his knowledge of the company's actual financial performance in 1994 and 1995 that allegedly made clear the deficiencies in the projections he submitted; (5) his refusal to permit plaintiff Henry access to the HLHZ fairness opinion; (6) his knowledge of and involvement in the issuance of the notes to the sellers for liabilities they incurred as a result of the first IRS audit; and (7) his knowledge of and participation in the second IRS audit and the events thereafter, including his drafting of a memorandum to ESOP participants in which he represented that the deficiency notices were without merit.

If anything at all, most of these allegations, especially those pertaining to the management projections, the fare wars, and the allegedly flawed HLHZ valuation, are relevant largely to the central issue in this case—whether the Trustee breached its fiduciary duty in permitting the transaction to occur. They highlight Price's alleged ineptitude in preparing the projections and HLHZ's alleged gaffes in relying

---

**9.** Plaintiff asserts no ERISA claims against Price and Owens as non-fiduciaries. (*See* Docket No. 27, ¶ 104; Docket No. 76, p. 9.)

on such projections without independent verification in its fairness opinion, both of which bear more relevance on whether the investigation conducted by and on behalf of the Trustee prior to the transaction were reasonable than on whether Price was knowingly concealing a breach. Plaintiff offers no evidence that remotely demonstrates that Price knew of these alleged deficiencies that preceded the transaction; if anything, his staunch defense and continued alleged misrepresentation of the company's equity value, which was based, whether correctly or incorrectly, in the valuation report, demonstrates that he did not know of the alleged breach.

His involvement in the IRS audits was not unusual, given that he was a company officer and/or an ESOP administrative committee member at all relevant times. It is difficult to understand just how the issuance of the notes to the sellers following the first IRS audit ties into the original transaction with the ESOP.[10] The ESOP, after all, also was given a dividend. As for the allegation that he refused to allow plaintiff Henry to see HLHZ's valuation of the convertible preferred stock purchased by the ESOP, it is initially noted that the Second Circuit has held that a failure to furnish such a report to a participant is not a breach of fiduciary duty. *See Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein,* 107 F.3d 139, 142–46 (2d Cir.1997). Plaintiff has offered no evidence that Price's failure to furnish the valuation was done to knowingly conceal the initial breach, as opposed to being a

proper refusal by an ESOP fiduciary. Sympathy is expressed for plaintiff's apparent argument that Price was a member of a conspiracy to overcharge the ESOP and line the sellers' pockets—and perhaps, by implication, the Trustee's, his own, and Owens's—but such participation must come with the knowledge that the transaction itself was a breach. Plaintiff has not demonstrated such knowledge. Price cannot incur co-fiduciary liability.

■ Owens is listed by himself in the allegations only twice, both times relating to the issuance of the notes to the sellers following the first IRS audit. Those notes, as noted, have no apparent connection to the initial sale of stock to the ESOP, a prerequisite for forming a basis of Owens's co-fiduciary liability. No allegations are made against Owens pertaining to the management projections, fare wars, or HLHZ's valuation prior to the transaction. Plaintiff does allege that Owens was aware of the company's actual financial performance in 1994 and 1995, which allegedly demonstrate that the projections were overstated and that the fare wars had a negative financial impact. However, the fact that Price—and HLHZ for that matter—may have been wrong does not in any way demonstrate that Owens, by merely knowing after the fact that the projections did not match up with the results, was knowingly participating in or concealing the alleged overcharge. Owens is also accused of knowingly participating in or concealing the alleged overcharge through his

---

10. In their papers, the parties make much ado about whether the issuance of the notes was a "distribution" or a "dividend." Resolution of this question is unnecessary. Plaintiff's motion papers do little to cure the court's utter bafflement as to whether the issuance of notes was to form an independent basis for a breach of fiduciary claim, or whether it was simply listed as more "evidence" of the alleged co-fiduciary status of Price and Owens. Because plaintiffs appear to steer the allegations regarding the issuance of the notes toward the issue of whether Price and Owens are co-fiduciaries, and because it is difficult to understand how the allegations could independently form an independent basis for an ERISA breach of fiduciary duty claim by the participants, it is here found that it is the latter.

participation in the audits, and company representations thereafter that claimed the IRS was in error. As counsel to the sellers, who were issued deficiency notices themselves, this does not strike one as unusual. He was acting on their behalf to lower any payments they, or the company, had to make as a result of the transaction. In no way does it show he was knowingly participating in or concealing the initial breach.

Plaintiff's best argument for co-fiduciary liability is that Price and Owens knowingly participated in or concealed the breach by failing to pursue payment from the sellers pursuant to Section 5.7 of the stock purchase agreement. Price and Owens, however, were both ESOP fiduciaries at this time, so the more proper claim against them in this regard is a direct breach of fiduciary duty claim. Under such a claim, it is more proper to argue they did not conduct a reasonable investigation in making that decision. Couched as a co-fiduciary claim, however, plaintiff is required to demonstrate that such a decision was a knowing participation in and/or concealment of the alleged overcharge. The lack of evidence, even viewed most favorably to plaintiff, on Price's and Owens's subjective intent or knowledge with respect to this decision, and all other decisions they made or knowledge they had, precludes co-fiduciary status. Plaintiff's claims against Price and Owens for their failure to invoke Section 5.7 are addressed under the third basis for *Count One*.

Therefore, Price's and Owens's motions for partial summary judgment on the first basis of *Count One* will be granted, and that part of the complaint will be dismissed against them.

### c. Sellers and CommutAir

■ Despite plaintiff's claim that it presents an issue of fact for trial, it is difficult to comprehend just how the sellers are ESOP fiduciaries with respect to the alleged overcharge. They clearly were not named fiduciaries. To the extent plaintiff is alleging that the sellers were *de facto* fiduciaries for their role in appointing the Trustee to represent the ESOP, such an argument is rejected for the same reasons stated above as to why Owens is not a *de facto* fiduciary. To the extent plaintiff is alleging the sellers are responsible for the breach by virtue of co-fiduciary status, such an argument is rejected because the sellers never were and never have been named fiduciaries sufficient to invoke Section 1105, and, in any event, any active part they took in the negotiation and term-setting process can be solely attributed to their role as the selling parties.

■ CommutAir, through its board of directors, is a fiduciary with respect to the ESOP, but only insofar as the company was given the power in the plan and trust documents to monitor and remove the Trustee from its fiduciary position. This particular duty, and whether it was breached, is encompassed within the fourth basis for *Count One*. Therefore, the sellers and CommutAir, must be dismissed from the first basis of *Count One*.

### C. Basis Two: Permitting the ESOP to Engage in a Prohibited Transaction

■ The second basis for *Count One* is that defendants breached their fiduciary duties in permitting the ESOP to engage in a transaction prohibited by ERISA. Under 29 U.S.C. § 1106(a), a fiduciary may not cause a plan to engage in transaction with a "party in interest" which involves a direct or indirect sale or exchange of plan property, lending of money or extension of credit, or transfer or use of plan assets. Here, it is clear that, for the purposes of Section 1106, the sellers were

"parties in interest." *See* 29 U.S.C. § 1002(14)(H) and (C) (defining "party in interest" as, *inter alia,* "an employee, officer, director, . . . or a 10 percent or more shareholder directly or indirectly," of "an employer any of whose employees are covered by [the] plan [at issue]").

### 1. *Occurrence of a breach*

However, exempted from the prohibition in Section 1106 is "the acquisition . . . by a plan of qualifying securities . . . if such acquisition . . . is for adequate consideration[.]" 29 U.S.C. § 1108(e). Therefore, the applicability of this exemption can only be resolved after it is determined whether the Trustee breached its fiduciary duty in permitting the transaction to occur. Such a determination will indeed involve a finding as to the fair market value of the convertible preferred stock on the date of purchase, and will by implication determine the availability of the Section 1108(e) exemption. It should also be noted that, even if the exemption does apply, plaintiff must still prove that the transaction itself was prohibited, and defendants will have an opportunity to present any other defenses they may have to this basis of *Count One.*[11]

### 2. *Responsibility for alleged breach*

For the reasons stated in the discussion of which parties are responsible for the alleged overcharge, the Trustee is a fidu-ciary that would be responsible for this alleged breach, while Price, Owens, and the sellers are not. CommutAir, as noted *supra,* is a fiduciary to the extent it had a duty to monitor and remove the Trustee. Whether such duty was breached is addressed in the fourth basis of *Count One.*

### 3. *Disgorgement of profits by non-fiduciary*

As part of the *relief* for permitting the ESOP to engage in the transaction,[12] plaintiffs, purportedly as part of their partial summary judgment motion, argue that the sellers, as parties in interest, should be required to disgorge the profits they received as a result of the sale of convertible preferred stock because such sale was a prohibited transaction under ERISA. Both the Supreme Court and the Second Circuit have indicated that disgorgement of the profits may be an appropriate remedy. *See Mertens v. Hewitt Assoc.,* 508 U.S. 248, 260–64, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1213 (2d Cir. 1987). As noted, there does not seem to be much of a dispute that the sellers were, indeed, parties in interest. However, also as noted, whether the transaction was prohibited (i.e., whether the statutory language in Section 1106 has been fulfilled and whether the exemption in Section 1108(e) applies) cannot be resolved on

---

**11.** Understanding and frustration are expressed that this basis of *Count One* seems to largely, if not entirely, mirror the first basis of *Count One.* Plaintiffs' First Amended Complaint and moving papers are, indeed, in no danger of being adopted as form pleadings. However, this basis seems to be more specific than the first basis, and will require plaintiffs to demonstrate not that it was merely unreasonable, or the product of unreasonable investigation, to permit the ESOP to purchase the stock on the terms that it did, but, rather, that it was unreasonable or the product of unreasonable investigation to allow the ESOP to engage in a transaction prohibited by the language of Section 1106. The burden in proving this is apparently greater, and, if plaintiffs do not prevail on the first basis of *Count One,* it is difficult to conceive of a scenario where they can prevail on the second.

**12.** It is emphasized that the sellers are discussed under this basis for *Count One* only to the extent plaintiffs allege they are responsible for the remedy flowing from the breach, and not for the breach itself.

summary judgment. Further, even assuming the language is fulfilled and the exemption is unavailable, the sellers will be afforded the opportunity to present any defenses to the specific remedy of disgorgement. Thus, whether this type of *relief* is available is an issue to be decided at trial, and plaintiff's summary judgment motion in this regard must be denied.

### D. Basis Three: Failing to Pursue Payment from the Sellers under Section 5.7

The third primary basis for *Count One*, that failing to pursue payment from the sellers after the IRS settlement was a breach of fiduciary duty, is temporally disconnected from the initial alleged overcharge and notes issued to the sellers. It focuses upon the knowledge and actions of the fiduciary or fiduciaries after the settlement up until the time the decision was made to not pursue payment from the sellers, and whether such a decision was a breach of fiduciary duty. Encompassed within the discussion of this basis, therefore, is plaintiff's motion to strike certain declarations and affidavits purporting to attest to the meaning of "final determination" as improper expert testimony and/or improper parol evidence. Also, it is to this part of *Count One* that defendants and plaintiff largely direct their motions for partial summary judgment, raising issues as to whether, in electing not to pursue payment from the sellers under Section 5.7, it was or was not a breach of fiduciary duty, and, in the event it was, which parties were fiduciaries responsible for the breach.

### 1. Occurrence of a breach

 As noted, Section 1104(a) of ERISA imposes upon fiduciaries a strict duty of loyalty and a duty to act as a reasonable fiduciary would in the same or similar circumstances. Plaintiff claims the Trustee, Price, and Owens, as ESOP fiduciaries, breached those duties by failing to pursue payment from the sellers pursuant to Section 5.7 after the settlement of the deficiency notices arising out of the second IRS audit. "[Fiduciaries] have a fiduciary duty 'to act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries.'" *Diduck v. Kaszycki & Sons Contractors, Inc.,* 874 F.2d 912, 916 (2d Cir.1989) (quoting *Cent. States Southeast and Southwest Areas Pension Fund v. Cent. Transp., Inc.,* 472 U.S. 559, 571, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985)). This does not mean that a fiduciary has a duty to sue or take action against parties in every circumstance where it is arguably justified, *id.* at 917, but it does mean a fiduciary must "investigate the possibility of a lawsuit and other options and ... make an informed decision whether to pursue any. Failure to do so ... [is] a breach of duty." *Ches v. Archer,* 827 F.Supp. 159, 167 (W.D.N.Y.1993).

 Plaintiff claims that the settlement of the deficiency notices arising out of the second IRS audit amounted to a "final determination" by the IRS or otherwise that the fair market value of the convertible preferred stock purchased by the ESOP was $51 million, which was $9 million less than the actual amount paid by the ESOP.[13] In support, plaintiff points out

---

13. As noted, *supra,* Section 5.7 of the stock purchase agreement provided that "[i]n the event of a final determination by the Internal Revenue Service, the Department of Labor, a court of competent jurisdiction or otherwise that the fair market value of the shares of ESOP Convertible Preferred Stock as of the Closing is less than the Purchase Price, then the Sellers, jointly and severally] shall pay to the [ESOP] an amount equal to the difference between the Purchase Price and said fair market value for such shares of ESOP Convertible

that the eventual settlement figures reflect calculations based on $51 million. Defendants admit that $51 million was used as a base amount to calculate the level of deductibility of interest from the company's contributions to the ESOP, but argue that it was never finally determined that the purchase price itself was excessive, and the stipulated decisions from the Tax Court do not expressly admit the same.

While the Tax Court, by merely entering judgment in accordance with the parties' stipulations without findings of fact or conclusions of law, or any indications of the same, did not make a final determination,[14] it is here found, as a matter of law, that the IRS did. The final determination made was that the fair market value of the convertible preferred stock, at the time it was purchased by the ESOP, was $51 million. Such determination was made by the IRS's agreeing to the stipulations wherein the convertible preferred stock was valued at $51 million. Even if it was a determination made solely for the purpose of calculating deductibility, defendants do not argue that such a figure was only to be used temporarily. In fact, they agree that the figure was to be used going forward. Thus, whatever the purpose of using the value, it was a final determination by the IRS. The alleged purpose of using that value is irrelevant—it was a final determination of fair market value, and Section 5.7 should have been invoked.

 However, contrary to plaintiff's arguments, this finding in and of itself does not mandate a finding that the fiduciaries breached their duties in not pursing

payment from the sellers pursuant to Section 5.7.[15] In other words, that their decision turned out to be erroneous does not mean that it was unreasonable at the time it was made. Defendants argue that they determined that the expense in pursuing a claim under Section 5.7 was outweighed by the likely prospect that such a claim would fail. This argument is based on the allegation that each person involved in the actual negotiation and drafting of Section 5.7—from the ESOP's own legal counsel to Owens, who represented the sellers—believed and intended that it was to apply only where the issue of the fair market value of the stock was actually litigated and decided by a court or other appropriate body, and that it was not to apply to settlements. Plaintiff contends that these arguments, contained in declarations and affidavits, should be excluded from consideration per the parole evidence rule and the rules of evidence pertaining to expert testimony.

 Plaintiff's contentions in this regard are rejected. First, when adjudging whether the fiduciaries acted reasonably prior to making the decision not to pursue payment from the sellers under Section 5.7, what the parties believed and intended in drafting the section is indeed relevant. Whether they are to be believed is another issue, but their beliefs and intentions do bear on the issue of whether there was a breach of fiduciary duty under ERISA. Second, and perhaps a more specific restatement of the first, initiating such conversations goes to whether a rea-

---

Preferred Stock, plus interest ..." (Docket No. 27, First Amended Compl., Ex. A.)

14. *See United States v. Int'l Bldg. Co.*, 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953); *see also Kroh v. C.I.R.*, 98 T.C. 383, 401, 1992 WL 64746 (1992).

15. Nor does this finding represent a finding that the fair market value of the convertible preferred stock was $51 million at the time it was purchased. The finding is only that the IRS believed it to be. The belief of the IRS as to the fair market value is in no way binding on the court's determination of the same in the first or second bases of *Count One*.

sonable investigation was indeed undertaken. Third, the parol evidence rule is inapplicable to this case. While this claim does deal peripherally with a contract, it does so only to the extent necessary to determine whether defendants' interpretation of Section 5.7 was reasonable. The contract is *not* being interpreted—rather, an assessment is being made as to whether defendants' interpretation of the contract, as part of their alleged investigation into whether to make a demand under Section 5.7, was reasonable. Finally, rules of evidence pertaining to expert testimony are irrelevant. As noted, because the reasonableness of defendants' actions are in question, what was believed and intended is relevant. In addition, they negotiated and/or drafted Section 5.7, so any testimony as to its meaning comes from personal experience.

Plaintiff does, however, raise factual questions with regard to whether the investigation was reasonable. Pitted against defendants' intentions and beliefs regarding Section 5.7 are the facts that a second, independent valuation was not obtained, and that the defendants, or the parties on whom they relied in making the decision not to pursue any action under Section 5.7, were biased or had a motive to find that there was no final determination. The Trustee admitted it could be sued if it permitted the ESOP to be overcharged. HLHZ, which claimed the IRS report on the fair market value of the convertible preferred stock was flawed, was the entity that prepared a fairness opinion stating that the transaction as priced was reasonable. As for Owens, a question of fact arises as to whether, in determining as an ESOP administrative committee member that no claim under Section 5.7 existed, he was able to divorce himself from his role as the sellers' representative. A decision to pursue a claim under Section 5.7 would mean demanding a $9 million payment

from the persons he represented in the transaction. As for Price, pursuing payment would have exposed him to the argument that his management projections, which were instrumental in HLHZ's fairness opinion, were negligently prepared, or worse, intentionally misleading. In short, all of these parties—Owens, Price, the Trustee, and the parties working on the Trustee's behalf—would have had to admit their own errors in the original transaction, and perhaps open themselves up to potential liability therefor. All of this, if taken as true, brings into serious question whether fiduciary duties were breached in not seeking a second, *independent* valuation of the stock in between and/or after the deficiency notices were received and the IRS settlement. Thus, summary judgment on the second basis of *Count One* cannot be premised on a lack of material questions of fact.

### 2. *Responsibility for breach*

#### a. *Trustee, Price, and Owens*

██ Assuming for the purposes of this discussion only that it was a breach of fiduciary duty not to pursue and/or demand payment from the sellers of the difference between the fair market value and the purchase price pursuant to Section 5.7, there can be no serious dispute that the Trustee, Price, and Owens would be responsible for such a breach. The Trustee was the party hired to represent the ESOP in the transaction and beyond as trustee, and Price and Owens were ESOP administrative committee members.

#### b. *Sellers and CommutAir*

██ To the extent that plaintiff claims the sellers are also somehow liable for the decision not to pursue payment under Section 5.7, defendants' motion for partial summary judgment will be granted.

The sellers were not fiduciaries, and any liability they may have arising out of the entire sequence of events in this case would be by virtue of their status as parties in interest to a prohibited transaction that was not for adequate consideration, assuming plaintiffs can demonstrate the same at trial. CommutAir was not a fiduciary with respect to the decision to not pursue or demand payment from the sellers. Insofar as it retained fiduciary capacity to supervise, monitor, and perhaps remove the Trustee, Price, and Owens for the same, such is discussed in the fourth basis for *Count One*.

### 3. *Loss occasioned by the breach*

While a district court is indeed vested with considerable discretion in fashioning a remedy for a breach of fiduciary duty, *see Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12, 16 (2d Cir.1991), a plaintiff is not excused from demonstrating or alleging at least some loss that is causally connected to the breach, *see Diduck*, 974 F.2d at 279 (stating that "proof of a causal connection ... is required between a breach of fiduciary duty and the loss alleged"); *see also Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir.1995). Thus, despite the existence of factual questions regarding whether it was a breach of fiduciary duty to not pursue or demand payment from the sellers under Section 5.7, plaintiffs must still demonstrate that such a decision caused them damages or a loss in order to survive summary judgment. Any ambiguity in a loss is to be resolved against the breaching party. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985). The Second Circuit in *Donovan* indicated that a proper measure of damages would be "any profit which would have accrued to the trust estate if there had been no breach of trust." *Id.* at 1054 (quotations and citation omitted).

Here, plaintiff does not specifically allege any loss from the failure to pursue

payment from the sellers under Section 5.7. Any argument that such a loss is $9 million, the difference between the fair market value and the purchase, is rejected. Section 5.7 is not a self-executing provision. Had there been no breach—i.e., had the fiduciaries invoked Section 5.7—payment from the sellers was not automatic. A demand upon them would have had to be made first. Then, and only if the sellers did not dispute their obligation to pay said difference, the ESOP would be reimbursed. Thus, the decision not to invoke Section 5.7 did not directly cause a loss to the ESOP of $9 million.

Plaintiff has offered no testimony, expert or otherwise, as to any other loss it allegedly suffered due to the failure of the fiduciaries to invoke Section 5.7, and none has been found even with a liberal reading of the pleadings. The decision not to invoke Section 5.7 was made at some point after the entry of the Tax Court decisions in 1999. No matter when such a decision was made, the ESOP to this day is not barred from bringing a common law breach of contract claim against whichever defendants it believes is suitable. *See* N.Y.C.P.L.R. § 213 (statute of limitations for breach of contract claims is six years); *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir.1997). It is certainly possible that plaintiff incurred or will incur damages for the failure to pursue Section 5.7 and/or any delay in bringing suit if that failed, but none have been alleged. Thus, despite the serious aspersions that have been intentionally cast upon defendants and their conduct by plaintiff, there is no choice but to dismiss this part of *Count One* as against all defendants.

### E. *Fourth Basis: Failure to Monitor, Supervise, and/or Remove Fiduciaries*

The fourth primary basis for *Count One*, that it was a breach of fiduciary duty to

not properly monitor or supervise, and/or institute the removal of, the various ESOP fiduciaries. This basis can only be asserted against defendants CommutAir, Price, and Owens. With respect to CommutAir, plaintiff alleges that it failed to properly supervise the Trustee and the ESOP administrative committee for their actions relating to the first three breaches alleged in Count One, and to remove them for the same. With respect to Owens and Price, as ESOP administrative committee members, plaintiff alleges they failed to properly supervise and remove the Trustee. To understand this basis, it is helpful to parse out precisely what fiduciary duties are bestowed upon CommutAir, the Trustee, and Price and Owens as ESOP administrative committee members.

■■ The Trustee's primary duties to the ESOP can be divided into two categories—those exercisable in its sole discretion, and those exercisable upon the direction of the ESOP administrative committee. The duties relative to the former include the ESOP's negotiation, acquisition of financing for, and purchase of the convertible preferred stock, as well as the registration or holding in bearer form of any ESOP investment, and the exercise of voting rights upon non-CommutAir, ESOP-owned stock. (Docket No. 27, Ex. 27, §§ 3.6, 4.2.) With respect to the general hiring of "suitable agents," investing and re-investing of ESOP assets, securing of financing other than that noted above, settling of liabilities, voting on ESOP-owned CommutAir stock, and the valuation of ESOP assets, the Trustee's conduct was subject to the written directives of the ESOP administrative committee. *Id.* at § 4.3. Thus, after the purchase of the convertible preferred stock, it is clear that the ESOP administrative committee had the primary responsibility for administering the plan.

(Docket No. 27, Ex. 25, § 16.) It is equally clear that the committee had a duty to supervise and review the performance of the Trustee insofar as it acted as an ESOP fiduciary. *Id.* at § 16(c)(9).

Price and Owens were both appointed to the ESOP administrative committee after the convertible preferred stock was purchased, so any supervisory responsibilities that they did incur as committee members did not include the Trustee's alleged acts or inaction relative to the first or second basis for *Count One.* As plaintiff does not independently allege the wrongfulness of any Trustee action in between the purchase of such stock and the decision to not pursue or demand payment from the sellers under Section 5.7 of the stock purchase agreement, the only conceivable way Price and Owens could be liable under this basis is if they unreasonably failed to properly monitor, supervise, and review the performance of the Trustee in the conduct alleged to form the factual basis for the third basis of *Count One.* However, as noted above, plaintiff has failed to allege or offer any evidence of a loss directly related to the breach alleged in the third basis. It follows, then, that no loss has been alleged or proven with respect to Price's and Owens's supposed lack of supervision or monitoring of the same. Price and Owens must therefore be dismissed from the fourth basis of *Count One.*

■■ CommutAir was a fiduciary to the ESOP insofar as it had the ability to remove fiduciaries from their positions. Under the ESOP plan document, CommutAir, through its board of directors, is given the power to remove any ESOP administrative committee member upon 60 days' written notice. (Docket No. 27, Ex. 25, § 16(a).) Under the trust document, CommutAir is given the power to remove the Trustee upon 60 days' written notice. *Id.,* Ex. 27,

§ 7.2. Implicit in this power to remove is a fiduciary duty to supervise and/or monitor the Trustee and the ESOP administrative committee. Because plaintiff did not allege and is unable to prove any loss directly resulting from the failure to pursue or demand payment from the sellers under Section 5.7 (the third basis of *Count One* ), it follows that no loss could be alleged or proven for CommutAir's failure to supervise and institute the removal of fiduciaries for the same.

However, because the ESOP plan document makes the formation of the ESOP, and the fiduciary duties of the Trustee, retroactive to January 1, 1994, *id.* at Preamble, CommutAir did have a fiduciary duty to monitor, supervise, and perhaps remove if necessary, the Trustee in connection with the first two alleged breaches in *Count One.*[16] Defendants have not moved for summary judgment on the alleged breach of this duty, and, even if they had, it could not have been granted because determining whether CommutAir breached its duty to monitor, supervise, and perhaps remove, will be largely dependent on whether the Trustee breached its fiduciary duties on the first two bases in *Count One.*

### F. Other Issues Addressed Sua Sponte

The court finds it appropriate to address two issues *sua sponte.* The first is whether the court has subject matter jurisdiction over *Count Three,* and the second is whether defendant Champlain Air, Inc. is entitled to be dismissed from the entire case. The court also finds it appropriate to comment on *Count Two.*

### 1. Count Three: Jurisdiction

■ In *Count Three,* plaintiff alleges that Price, Owens, and the sellers, as officers and/or directors of CommutAir, breached their fiduciary duties toward CommutAir by committing corporate waste and wrongfully diverting corporate assets to the sellers and their wholly owned subsidiary, defendant Champlain Air, Inc., in violation of state law.[17] Whether subject matter jurisdiction exists over a state law claim may be raised at any time, by the parties or by the court *sua sponte,* and " '[i]f [such] jurisdiction is lacking, the action must be dismissed.' " *Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 193 (2d Cir.2003) (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700–01 (2d Cir.2000)). Plaintiff alleges that the court has subject matter jurisdiction over *Count Three* by virtue of the parties' diversity of citizenship pursuant to "28 U.S.C. § 1132(a)(1)," as well as "pendent and supplemental jurisdiction" pursuant to 28 U.S.C. § 1367(a). (Docket No. 27, ¶ 13.)

#### a. Diversity jurisdiction

■ Plaintiff claims the court has jurisdiction by virtue of the parties diversity of citizenship pursuant to "28 U.S.C. § 1132(a)(1)." *Id.* Neither an electronic computer search nor a review of the hard copy revealed the existence of any Section 1132(a)(1) in Title 28 of the United States Code. Perhaps plaintiff meant to cite to

---

**16.** While such a retroactive effect would also encompass the fiduciary duties and powers of the ESOP administrative committee, it has no effect on Price and Owens because neither was an ESOP administrative committee member before or at the time of the transaction. Even if they were, they still had no duty to supervise and monitor the Trustee because engaging in the transaction was left to the sole discretion of the Trustee. *See* Docket No. 27, Ex. 27, §§ 3.6, 4.2.

**17.** The claim is brought on behalf of CommutAir as a shareholder derivative claim pursuant to N.Y. Bus. Corp. Law § 626.

Section 1132(a)(1) of Title 29, which details who is entitled to civilly enforce ERISA. However, that section would only inform the court that plaintiffs Henry and Malinky are empowered to assert ERISA claims, not the state law claims in *Count Three*. The authority for asserting *Count Three* is found in N.Y. Bus. Corp. Law § 626, subject of course to any defenses to its use that defendants might have. Therefore, giving the benefit of the doubt to plaintiff, it will be assumed for the purposes of this discussion that plaintiff meant to type "28 U.S.C. § 1332(a)(1)," rather than "28 U.S.C. § 1132(a)(1)" or "29 U.S.C. § 1132(a)(1)," when alleging diversity jurisdiction in the First Amended Complaint.

28 U.S.C. § 1332(a)(1) gives federal courts jurisdiction over civil actions between "citizens of different States." To invoke Section 1332, however, the pleadings must demonstrate that "all adverse parties to a litigation are completely diverse in their citizenships." *Herrick Co. v. SCS Communications, Inc.*, 251 F.3d 315, 322 (2d Cir.2001) (citations omitted). "That is, diversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (emphasis in original). In other words, "diversity jurisdiction is not to be available when any plaintiff is a citizen of the same State as any defendant." *Id.* at 375, 98 S.Ct. 2396; *see also Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir.1990). Plaintiff is charged with the burden of demonstrating the complete diversity sufficient to properly invoke Section 1332(a)(1). *Herrick Co. v. SCS Communications, Inc.*, 251 F.3d 315, 322–23 (2d Cir.2001).

*Count Three* is alleged against Price, Owens, the sellers, and defendant Cham-

plain Air, Inc. Nowhere in the First Amended Complaint does plaintiff allege the citizenship of these defendants. (Docket No. 27, "Jurisdiction and Venue," ¶¶ 9–14.) In fact, nowhere in the First Amended Complaint does plaintiff allege its own citizenship. *Id.* Thus, plaintiff has failed to carry its burden of demonstrating complete diversity. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 80 (2d Cir.2001) (referring to this style of pleading—i.e., generally alleging diversity jurisdiction but failing to specify the citizenship of each party in the suit—as "dubious"). Even if plaintiff's failure to properly plead diversity jurisdiction is ignored, it can safely be assumed that Price, who worked at CommutAir's Plattsburgh, New York headquarters, and the ESOP or its participants, who presumably live and work in New York, are New York citizens, thereby destroying complete diversity and, consequently, jurisdiction under Section 1332(a)(1).

#### b. Supplemental jurisdiction

As noted, plaintiff also claims the court has "pendent and supplemental" jurisdiction over *Count Three* pursuant to 28 U.S.C. § 1367(a). Section 1367(a) "provides that a district court with original jurisdiction over a federal claim 'shall have supplemental jurisdiction' over all related state claims." *Small v. City of New York*, 274 F.Supp.2d 271, 282 (E.D.N.Y.2003). A state claim is sufficiently related "if it and the federal claim 'derive from a *common nucleus of operative fact.*'" *Cicio v. Does*, 321 F.3d 83, 97 (2d Cir.2003) (emphasis added) (citations omitted); *see also Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir.2000) (stating that "pendent party jurisdiction [is] possible where the claim in question arises out of the *same set of facts* that give rise to anchoring federal question claim against another party") (emphasis added). Also relevant to determining

whether to exercise supplemental jurisdiction over a state law claim are the " 'considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims.... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'" *Seabrook v. Jacobson*, 153 F.3d 70, 71–72 (2d Cir.1998) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).[18]

A simple review of the facts giving rise to the surviving ERISA claims, and those giving rise to the state law claims, clearly demonstrates no common nucleus of fact among *Counts One* and *Two* and *Count Three*. The allegations in *Count Three* arise out of the 1994 or 1995 transfer from CommutAir to defendant Champlain Air, Inc. of four World War II-era airplanes. Plaintiff claims CommutAir received no or inadequate compensation for the transfer. Following the transfer, plaintiff claims CommutAir stored the airplanes in one of its hangars, and its employees performed $1 million to $1.8 million worth of renovation work on the planes, both for no or inadequate consideration. Plaintiff alleges the costs associated with the storage and renovation were incurred without reimbursement by CommutAir.

In *Count Three*, plaintiff also alleges that the sellers' use of a corporate jet, acquired by CommutAir in 1994 for $5.8 million, was a waste of corporate assets, as CommutAir had agreements with other airlines that permitted the sellers to travel first class at no cost. Less than three months after plaintiff Henry allegedly raised his concerns about this with Price, the jet was transferred to defendant Champlain Air, Inc. in 2000 for allegedly no or inadequate consideration. A few months later, plaintiff alleges defendant Champlain Air, Inc. sold the jet "for an unreported amount." (Docket No. 27, ¶ 91.)

Plaintiff's two breach of fiduciary duty claims in *Count One* will both be tried against the Trustee, which is not even a named defendant in *Count Three*. Plaintiff itself expressly alleges that the factual bases of *Count One* are different than those of *Count Three*. Specifically, plaintiff alleges that *Count One* is based on "the acts set forth in paragraphs 29–83 and 93–100," while *Count Three* is based on "paragraphs 84–92." *Compare* Docket No. 27, ¶¶ 102–03, *with id.* at ¶ 115. In any event, a cursory glance at the allegations underlying the Counts leads to the inevitable conclusion that they are not factually related.

The focus of one claim (the first basis) in *Count One* will be on the reasonableness of the Trustee's investigation, and reliance on the results thereof, into the sellers' proposed sale of convertible preferred stock to the ESOP. Plaintiff does not allege any connection between the transfer, storage,

---

**18.** The Second Circuit has held that a discretionary rejection of supplemental jurisdiction is only proper "if founded upon an enumerated category of Section 1367(c)." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir.1998). However, its holding was issued in the context of a situation where the plaintiff had fulfilled the language of Section 1367(a), which prompted the court to declare that supplemental jurisdiction *must* be exercised. It follows, then, that where the district court determines that the mandatory language of Section 1367(a) has not been fulfilled, either supplemental jurisdiction must be declined, or, at the very least, the district court is granted discretion to grant or deny it subject to the principles of judicial economy, inconvenience, fairness, and comity.

and renovation of the airplanes and the reasonableness of the Trustee's investigation into the proposed transaction, nor can any be fairly inferred. Though plaintiff claims such transfer, storage, and renovation occurred from 1994 to 2000, it is less than clear whether the first three months—the operative time frame for the Trustee's investigation into the transaction—are encompassed therein. Similarly, there are no allegations that the Trustee's actions or investigation, or even the stock transaction itself, had any impact on the purchase, storage, or renovation of the airplanes.

The focus of another claim in *Count One* (the second basis) is on the more specific question of whether it was reasonable for the Trustee to permit the ESOP to engage in a prohibited transaction. As noted, this claim requires the resolution of several questions, the answers of which may come from the resolution of the first basis of *Count One*. Plaintiff has neither alleged nor offered a scintilla of evidence in support of the contention that the transaction itself, or the Trustee's actions prior thereto, derives from the same set of facts as the claims in *Count Three*.

The other claim over which the court has original jurisdiction is *Count Two*, wherein plaintiff seeks the removal of the ESOP fiduciaries for their alleged conduct. However, plaintiff itself again expressly distinguishes the factual basis for this *Count* from *Count Three*. Specifically, *Count Two* is based on "the acts set forth in paragraphs 29–56 and 93–100 herein, and the acts of fraud and concealment set forth in paragraphs 57–83 herein[.]" *Id.* at ¶ 108. The allegations that give rise to *Count Three* are found "in paragraphs 84–92[.]" *Id.* at ¶ 115. In other words, none of the alleged facts that gives rise to removing the ESOP fiduciaries are claimed as the factual basis for plaintiff's state law

claims in *Count Three*. Plaintiff's state law claims are factually distinct from all of the federal claims over which the court has original federal jurisdiction, and supplemental jurisdiction is therefore unavailable.

The only halfway arguable connection between *Count Three* and the ERISA claims is found in paragraphs 93–100 of the First Amended Complaint, which plaintiff claims form part of the factual basis for *Count One*. In those paragraphs, plaintiff alleges that the sellers, Price, and Owens "directly participated in the improper transactions alleged herein above," failed to object to the same, "failed to take other action to remedy the damages caused by the same[,]" and "failed to act as active shareholders on the ESOP's behalf and failed to institute a shareholder's derivative action against the [sellers] and [defendant] Champlain Air to recover damages for CommutAir and its shareholder, the ESOP." *Id.* at ¶¶ 93, 95. The paragraphs also allege that the Trustee ignored plaintiff Henry's stated concerns, and that Price and Owens, as members of the CommutAir board of directors, "breached their fiduciary duties by failing to monitor the actions of the ESOP fiduciaries in connection with … [t]he sale of CommutAir's Citation jet aircraft to Champlain Air in or about 2000[.]" *Id.* at ¶ 100(A)(4).

Aside from paragraph 100(A)(4), the facts alleged to form the basis of *Count Three* are not explicitly mentioned in paragraphs 93–100. Even if it is assumed that the general factual allegations in paragraphs 93–100 encompass the specific allegations in paragraphs 84–92—the alleged factual basis for *Count Three*—nothing at oral argument or in the moving papers indicated that plaintiff sought relief under ERISA for the allegations relating to the transfer, storage, renovation, and sale of the airplanes at issue in plaintiff's state

law claims. In fact, paragraph 100(A)(4) by itself, as it is stated in *Count One,* without paragraphs 84–92, which *Count One* does not encompass, does not make sense, much less provide a specific enough basis on which to state an independent claim under ERISA. Plaintiff's clear, stated intent in the First Amended Complaint was to have paragraphs 84–92 provide only the basis for the state law claims. Any reference to those paragraphs is conspicuously absent from the alleged factual basis for *Counts One* and *Two.* Therefore, as there is no common nucleus of operative fact for the ERISA and state law claims, supplemental jurisdiction is inappropriate.

Nothing relating to judicial economy, inconvenience, fairness, or comity changes this conclusion. Judicial economy is a nonfactor here, since, had *Count Three* survived, it likely would have been bifurcated from *Counts One* and *Two.*[19] *Counts One* and *Two* are to be tried to the bench, while resolution of *Count Three* would have most probably been through a jury trial, and would have taken place at a date determined after the bench trial.

Inconvenience also does not militate towards exercising supplemental jurisdiction over plaintiff's state law claims. The testimony needed to prove the facts relevant to *Count Three* is, as noted, distinct from that needed to prove the facts relevant to *Counts One* and *Two.* Therefore, because the factual scenarios underlying *Counts One/Two* and *Count Three* are so different, and because *Count Three* presents only questions of state law, it is here held that plaintiff must seek relief for *Count Three* in New York State court, which is quite capable of adjudicating the dispute.

Neither diversity nor supplemental jurisdiction exists or will be exercised over

*Count Three.* That part of plaintiff's First Amended Complaint will be dismissed without prejudice.

### 2. *Defendant Champlain Air, Inc.*

Plaintiff alleges that "[d]efendant Champlain Air, Inc. ('Champlain Air') is a New York corporation formed on or about January 6, 1994[,] by the [sellers]. Since formation, the [sellers] have collectively owned 100% of all shares issued and outstanding." *Id.* at ¶ 7. Champlain Air is named as a defendant in the now-dismissed *Count Three,* but is not named as a defendant in *Counts One* or *Two. Id.* at ¶¶ 105, 107–11. Thus, as no claims are left against it, the First Amended Complaint must be dismissed in its entirety as against Champlain Air, without prejudice.

### 3. *Count Two: Price and Owens*

In *Count Two,* plaintiff seeks the removal of the Trustee as ESOP trustee, and Price and Owens as ESOP administrative committee members. Under 29 U.S.C. § 1109(a), a district court *may* invoke its equitable power to remove "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries." Clearly, if the Trustee does not prevail on the first and second basis of *Count One,* the court *may* remove it as ESOP trustee. With respect to the first two bases for *Count One,* Price and Owens cannot be removed as fiduciaries, as neither was a fiduciary that breached responsibilities, obligations, or duties relative to the two breaches alleged. With respect to the third and fourth bases, however, the answer is less clear.

---

**19.** Subsequent to defendants' filing of the motion to bifurcate, the parties consented and stipulated that it would most appropriate to bifurcate *Count Three* from *Counts One* and *Two.* (Docket No. 102.)

The third basis was dismissed as against Price and Owens only because plaintiff failed to allege or offer any evidence that the failure to pursue or demand payment from the sellers pursuant to Section 5.7 directly caused the ESOP a loss. It was not dismissed for a lack of factual questions as to the reasonableness of their conduct in so failing to pursue or demand, or in so failing to monitor and supervise the Trustee in doing the same. The question presented, therefore, is whether the invocation of the equitable removal power in Section 1109(a) depends upon the success of a breach of fiduciary claim, including the demonstration of a loss that is causally connected to said breach, or whether it can be based on only actions allegedly representing a breach with no resulting loss. One supposes it could be argued that it is the latter, as the language in Section 1109(a) does not limit its reach to breaches under Section 1104 and includes not only the word "duties" when referring to a "breach," but also the words "responsibilities" and "obligations." On the other hand, the argument could be made that Section 1109(a) is essentially a remedy for a breach of fiduciary duty under another ERISA section, and its title, "[l]iability for breach of fiduciary duty," implies the same. Because it is a remedy for a breach of fiduciary duty claim, it follows that all elements of such a claim, including the demonstration of some causal connection between the breach and a loss, are necessary. However, because neither Price nor Owens moved for dismissal of *Count Two*, this issue need not be reached at this juncture.

## V. CONCLUSION

### A. *Issues for Bench Trial*

To recap, the first, second, and fourth bases for *Count One*, along with *Count Two*, will be tried to the bench. At trial, the first basis for *Count One*, that it was a breach of fiduciary duty to permit the alleged overcharge, will focus on the reasonableness of the conduct of the Trustee alone, and its investigation and reliance on the results thereof. One relevant consideration in this focus will be the actual fair market value of the convertible preferred stock on the date it was purchased. This consideration will require plaintiff and defendants to elicit expert testimony. Plaintiff's motion to exclude the testimony and report of defendants' valuation expert, Mr. Dana, will be denied. At this stage of the proceedings, Dana's qualifications and methodologies are sufficient to allow him to render an expert report and give testimony thereon. Plaintiff will be given an opportunity to challenge either or both at trial, and renew its motion at that time.

At trial, the second basis for *Count One*, will focus on the more specific question of whether it was reasonable to permit the ESOP to engage in a transaction prohibited by the language of Section 1106. Relevant to this focus will be whether the transaction fits the statutory language of Section 1106, and whether, even if it does, the transaction is exempted by the language of Section 1108(e). Whether the transaction is exempted pursuant to Section 1108(e) depends on whether the ESOP paid "adequate compensation" for the convertible preferred stock. Thus, the actual fair market value determination relevant to the first basis in Count One bears heavily on the second basis as well. In the event it is found that the Trustee breached its fiduciary duty on the second basis of *Count One*, issues will arise as to whether one *remedy* for that breach (*not* the breach itself) can be pursued against the sellers. Specifically, plaintiff claims the sellers should be required to disgorge their profits as parties in interest to a prohibited transaction. The sellers will be

permitted to assert any defenses they may have to such a remedy. Because such questions cannot be resolved at this stage of the proceedings, plaintiff's motion for partial summary judgment will be denied to the extent it seeks an order of disgorgement.

At trial, the fourth basis for *Count One* will focus upon the reasonableness of CommutAir's conduct in the monitoring and supervision of the Trustee in its investigation, and reliance on the results thereof, of the proposed transaction. Resolution of this basis may be entirely dependent on whether the Trustee's conduct relative to the first and second bases in *Count One* was reasonable. In other words, if it is found that the Trustee's actions were not wrongful within the meaning of ERISA, it is difficult to imagine a situation where the supervision and monitoring of the same was a breach of fiduciary duty.

Finally, at trial, *Count Two* will focus on whether, in light of the alleged conduct, it is proper to remove the Trustee as an ESOP fiduciary, and Price and Owens as ESOP administrative committee members.

### B. Dismissed Claims and Moot Motions

The first two bases for *Count One* must be dismissed as against Price, Owens, the sellers, and CommutAir for plaintiff's failure to demonstrate their fiduciary or cofiduciary status. The third basis must also be dismissed as against the sellers and CommutAir for plaintiff's failure to demonstrate their fiduciary status. As noted, the sellers remain in the case only to the extent that they may be implicated in a possible remedy in the event plaintiff prevails on the second basis for *Count One*, and CommutAir remains as a defendant on the fourth basis. Therefore, Price's and Owens's motions for partial summary judgment, and that of defendants to the extent it seeks a determination that the sellers committed no breaches of fiduciary duty, are granted.

The third basis for *Count One*, that it was a breach of fiduciary duty to not pursue or demand payment from the sellers pursuant to Section 5.7 after the settlement with the IRS, must be dismissed. While as a matter of law the IRS did make a final determination so that Section 5.7 should have been invoked, and there are factual questions as to the reasonableness of actions and/or investigation of the Trustee, Price, and Owens in electing not to pursue the sellers under Section 5.7, plaintiff has failed to allege or offer any proof of a loss occasioned by such an election, much less a causal connection between the loss and the election. Consequently, to the extent CommutAir, Price, and Owens are alleged to have breached fiduciary duties in failing to supervise, monitor, and perhaps remove, a fiduciary or fiduciaries with respect to the conduct alleged in the third basis, the fourth basis for Count One must be dismissed as well. Thus, plaintiff's motion for summary judgment on the third basis of *Count One* will be denied, defendants' motion on the same will be granted, and plaintiff's motion to strike certain declarations and affidavits purporting to resolve the meaning of the term "final determination" in Section 5.7 will be denied as moot. To the extent defendants' and Price's and Owen's motions for summary judgment implicitly apply to the fourth basis, only as part of that basis is described in this paragraph, such motions also must be granted.

With respect to *Count Three*, which alleges state law claims against Price, Owens, and the sellers, the court has no subject matter jurisdiction and such claims will be dismissed *sua sponte*. Plaintiff has not properly (or at all) plead diversity jurisdiction, and the alleged facts upon

which *Count Three* are based are not part of a nucleus of fact that is common to *Counts One* and *Two,* over which there is original federal jurisdiction. Thus, supplemental jurisdiction over the state law claims is not required, and there are no equitable considerations that require the exercise of the same. Therefore, as jurisdiction is an issue properly raised at any time, *Count Three* will be dismissed without prejudice, and, for this and the other reasons explained in this opinion, defendants' motion for bifurcation is denied as moot.

Accordingly, it is

ORDERED that

1. The First Amended Complaint is DISMISSED in its entirety against defendant Champlain Air, Inc.;

2. With respect to the first and second bases of *Count One,*

a. Defendants' Price and Owens motions for summary judgment are GRANTED, and that part of the First Amended Complaint is DISMISSED with prejudice as against them;

b. Defendants' motion for summary judgment is GRANTED to the extent it seeks a determination that the sellers and CommutAir committed no breaches of fiduciary duty, but the sellers will remain in the case in the event they are required to defend against the remedy of disgorgement of profits;

c. Plaintiff's motion for summary judgment is DENIED to the extent it seeks an order requiring the sellers to disgorge any profits they received as a result of the sale of convertible preferred stock to the ESOP;

d. Plaintiff's motion to exclude the testimony and report of defendants' valuation expert, Robert Dana, is DENIED without prejudice to renew at trial;

4. With respect to the third basis of *Count One*

a. Plaintiff's motion for summary judgment is DENIED;

b. Defendants' motion for summary judgment is GRANTED, and that part of the First Amended Complaint is DISMISSED with prejudice as against all defendants;

c. Plaintiff's motion to strike certain declarations and affidavits is DENIED as moot;

5. With respect to the fourth basis of *Count One,*

a. Defendants' Price and Owens motions for summary judgment are GRANTED, and that part of the First Amended Complaint is DISMISSED against them with prejudice.

b. Defendants' motion for summary judgment is GRANTED to the extent it seeks to hold CommutAir liable for failing to supervise, monitor, and perhaps remove the Trustee, Price, and Owens, with respect to their failure to pursue or demand payment from the sellers pursuant to Section 5.7 of the stock purchase agreement, and DENIED in all other respects.

6. *Count Three* is DISMISSED, without prejudice;

7. Defendants' motion to bifurcate, and the parties' consent to a bifurcation, are rejected and DENIED as moot.

IT IS SO ORDERED.